Charles LaDUKE, Carlos Garcia, and Consulo Garcia, individually and on behalf of all persons similarly situated, Plaintiffs,

v.

Alan C. NELSON, in his official capacity as the National Commissioner of the INS; Gordon A. Ruth, in his official capacity as the Director of the INS for the Northern Region; James B. Turnage, in his official capacity as District Director for the INS for the State of Washington; William T. Carty, in his official capacity as Officer in Charge of the Spokane Substation of the INS; John Green, in his official capacity; Kenneth Langford, in his official capacity as Chief Border Patrol Agent for the Spokane Substation; Dale K. Sewell, Johnny L. Minyard, Leslie Anderson, John Doe Three, and John Doe Four, individually, and in their capacities as employees, agents and persons acting in concert with the INS, Defendants.

No. C–77–356.

United States District Court, E.D. Washington.

Dec. 23, 1982.

Michael J. Fox, Houghton, Cluck, Coughlin & Riley, Seattle, Wash., Erin Moore, Evergreen Legal Services, Wenatchee, Wash., for plaintiffs.

John Lamp, U.S. Atty., Carroll D. Gray, Asst. U.S. Atty., Spokane, Wash., for defendants.

## AMENDED MEMORANDUM DECISION

ROBERT J. McNICHOLS, Chief Judge.

The issue in this class action is the constitutionality of searches and interrogations conducted by Border Patrol Agents and criminal investigators of the Immigration and Naturalization Service (INS) in farm labor housing areas located within the Spokane Sector. Plaintiffs, on behalf of their class, contend that the practices of the INS agents violate the Fourth Amendment rights of residents of farm labor housing to be free from unreasonable searches and seizures. Plaintiffs seek injunctive relief to prohibit INS from using enforcement practices which do not comply with the requirement of the Fourth Amendment. The defendants resist injunctive relief on alternative grounds. First, defendants contend that the agents' practices do not violate the constitutional rights of residents of farm labor housing, and second, that there is no evidence that agents are likely to commit constitutional violations in the future. I denied a preliminary injunction on October 13, 1981. A trial to the Court was held in June, 1982. Plaintiffs and defendants submitted post-trial memoranda and proposed Findings of Fact and Conclusions of Law.

## FACTS

The named plaintiffs, Charles LaDuke and Carlos and Consulo Garcia, are United States citizens who have resided in farm labor housing within the Spokane Sector. The class they represent is composed of:

All persons who, since August 1, 1974, have resided, reside, or will reside in farm labor housing located within the formal jurisdiction of, or actual territory patrolled by criminal investigators or border patrol agents who are directed from the offices of the Immigration and Naturalization Service in Spokane, WA; provided that for the purposes of this class definition "farm labor housing" shall include any dwelling unit used or intended to be used as living or sleeping quarters for farm laborers, whether it be located on a single parcel of land or on a common parcel of land with other units; whether it be composed of dormitories, cabins, apartments, trailers, tents, makeshift units, motel or hotel rooms, boarding houses, single family dwellings, or multifamily dwellings; whether it be located

on or off a place of agricultural employment; whether it be located within or outside a city or town; whether it be provided by an agricultural employer or other entity; and whether it be publicly or privately owned.

The defendants include the following administrative and supervisory personnel:

Alan C. Nelson, Commissioner of the INS

Gordon A. Ruth, Director of the INS for the Northern Region

James B. Turnage, Jr., District Director of the INS for the State of Washington

William Carty, Officer in Charge of the Spokane Suboffice

Kenneth Langford, Chief Border Patrol Agent for the Spokane Sector

John Greene, Chief Border Patrol Agent for the Spokane Sector until 1980.

The following Border Patrol Agents are named as defendants: Johnny L. Minyard, Dale K. Sewell, Leslie Anderson, John Doe Three and John Doe Four.

The Spokane Sector is comprised of the Eastern District of Washington, a portion of Northern Idaho, and a portion of Western Montana. In the Eastern District of Washington, Border Patrol officers operate out of stations in Spokane and Oroville, under the supervision of Agents Anderson and Minyard, respectively.

*Searches and Interrogations in Farm Labor Housing*

Substantial portions of the agricultural lands of Central and Southeastern Washington are devoted to various crops which require extensive hand labor in the fields. Because of the needs of the growers for field workers during various stages of the growing season, the areas are particularly attractive to itinerant workers, many of which are citizens of Mexico. Some of the workers are legally in the United States and some illegally. Quarters of one type or another are provided for these itinerant workers, usually in proximity to the orchards and fields where the work is performed. The workers and their families occupy these quarters for various periods of time during several stages of the growing season. They have sleeping and cooking facilities and make the quarters their temporary home. The housing units are occupied by citizens, legal aliens and illegal aliens.

During the years 1974 through 1979 INS Border Patrol Agents and criminal investigators have regularly conducted surprise searches or raids in these farm labor housing areas. The evidence reflects that through the years these activities generally followed a standard pattern:

1. The searches were conducted primarily during hours of darkness or daybreak when workers could normally be found in their living quarters.

2. Most, if not all of the officers, were uniformed, wore badges and carried exposed pistols, handcuffs and flashlights.

3. The officers approached the housing areas in government-marked vehicles, including van type vehicles suitable for detention of those to be arrested.

4. If possible, the officers sealed off roads or paths leading out of the housing area. Officers were also stationed at the rear of the housing units to prevent departure of the occupants.

5. Officers then proceeded from door to door within the camp, knocking on doors, and interrogating residents concerning their citizenship status and the status of other persons within the particular residence and the camp. Occupants who exited from the rear or sides of the units were apprehended, detained and interrogated. Those believed to be illegal aliens were arrested.

6. When residents opened doors, officers attempted to engage them in conversation in English to determine if the resident spoke English or had a noticeable accent.

7. If the officer believed that the person at the door was an alien or that aliens might be present inside the residence, he would ask for permission to enter the residence to search for and interrogate occupants. Officers did not advise residents of the right to refuse entry.

8. Agents in the Spokane Sector have never obtained warrants for such searches.

9. Officers routinely checked farm labor housing on the basis of anonymous telephone tips concerning aliens in the housing area, information that illegal aliens had been apprehended in the camp in the past, or merely because they happened to be in proximity to the housing area.

INS POLICY

Official INS policy regarding searches and interrogations in farm labor housing has changed since the initiation of this action in 1977. The first restriction occurred on November 26, 1979 when Attorney General Benjamin R. Civiletti directed INS to discontinue investigations at places of residence as a common enforcement technique. On March 18, 1980, the Attorney General issued more stringent restrictions on INS search operations to promote cooperation with the census. The guidelines were relaxed again on January 13, 1981. The Attorney General issued the following memorandum regarding INS searches:

EFFECTIVE IMMEDIATELY, INS SEARCH POLICY SHALL BE TO

1. RESTRICT SEARCHES OF RESIDENCES TO ROUTINE CASEWORK OR SEARCHES AUTHORIZED BY WARRANT OR COURT ORDER;

2. RELY ON CONSENT IN SEARCHES OF PLACES OF EMPLOYMENT AND OTHER NON–RESIDENT LOCATIONS AS SET FORTH IN THE NOVEMBER, 1979, SEARCH ANNOUNCEMENT; and

3. DEVELOP A PROGRAM, USING SEARCH WARRANTS, TO WORK JOINTLY WITH OTHER FEDERAL AND STATE AGENCIES TO UNCOVER IMMIGRATION AND OTHER VIOLATIONS OF LAW BY EMPLOYERS THAT MAY BE ATTENDANT TO THE EMPLOYMENT OF ILLEGAL ALIENS.

The Attorney General's directive was transmitted with the following message from David Crosland, Acting Commissioner:

THE ATTACHED POLICY REQUESTED BY THE COMMISSIONER FROM THE ATTORNEY GENERAL IS EFFECTIVE UPON RECEIPT. CLARIFICATION IS BEING SOUGHT CONCERNING FARM AND RANCH CHECK BY BORDER PATROL RELATING TO LABOR CAMPS.

On January 16, 1981, Mr. Crosland sent the following message to INS regional offices, district directors and border sector headquarters:

Farm and ranch operations at labor camps may be conducted between official sunrise and official sunset when *knowing consent* is given to enter the residence. Any other time or when consent has not been given, a search warrant is required. (Emphasis added)

On February 13, 1981, Kenneth Langford, Chief Border Patrol Agent for the Spokane Sector, issued a memorandum to all stations under his supervision. This memorandum attached copies of Crosland's memoranda of January 14 and 16 and ordered:

Except for the checking of residences, our operations are to resume under the same guidelines as prior to the restrictions imposed by the Attorney General by wire of March 28, 1980 in connection with the census.

Our enforcement efforts will continue to be focused primarily on employed illegal aliens at the place of employment. In this regard, farm and ranch checks at farm labor camps may be conducted between sunrise and sunset when knowing consent to enter is given, since in most cases the occupants are residing at the place of employment. Under this provision, only the farm labor camps which are located at the place of employment or within the close proximity may be checked. In all other cases, including farm labor camps located in cities and towns, a warrant or court order is required. In any case in which it may not be clear if a warrant or court order is required, the

matter will be referred to this office before any action is taken.

The consent to enter a unit of a farm labor camp can be given only by the person who has the right to possession of such premises. Officers will properly identify themselves and clearly state the purpose of the request to enter. The words chosen must convey a courteous request, not a command, in order to insure a voluntary consent. The foregoing is not applicable, of course, if entry into a residence is for the purpose of accompanying an alien in custody who desires to secure his personal belongings from the premises.

Within a month of his memorandum Mr. Langford established the policy that all farm and ranch checks in farm labor housing areas must be personally approved by the Chief Border Patrol Agent for the Spokane Sector. Since then no agent has sought such approval. It is clear, however, that the acknowledged INS policy in this sector, if not enjoined, is to follow in the future the same procedures previously followed except for the limitation that the activities occur only between "sunrise and sunset." The Court takes judicial notice that during the harvest season, that period is between approximately 4:00 a.m. and 9:00 p.m.

## LEGAL STANDARD FOR ISSUANCE OF A PERMANENT INJUNCTION

The basic requisites for the equitable relief sought are the likelihood of substantial and immediate irreparable injury and the inadequacy of remedies at law. *O'Shea v. Littleton,* 414 U.S. 488, 502, 94 S.Ct. 669, 679, 38 L.Ed.2d 674 (1974). In determining whether a permanent injunction should be issued, the Court must decide three issues. The Court must first decide if the plaintiffs have prevailed on the merits. If plaintiffs have succeeded, then the Court must decide whether the "balance of equities" favor injunctive relief. If so, the Court must decide what form of relief is appropriate. *Si-*

erra Club v. Alexander, 484 F.Supp. 455, 471 (N.D.N.Y.1980), aff'd 633 F.2d 206 (2d Cir.1980).

## PLAINTIFFS HAVE PREVAILED ON THE MERITS

■ Plaintiffs have demonstrated that the practices of the INS in conducting searches and interrogations in farm labor housing violate the constitutional rights of plaintiffs. The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." This constitutional prohibition is only against unreasonable searches and seizures, not all searches and seizures. *Terry v. Ohio,* 392 U.S. 1, 8, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968). The central inquiry under the Fourth Amendment is the reasonableness of the particular government invasion of a citizen's personal security considering all the circumstances. *Terry* at 19, 88 S.Ct. at 1878. The basis for the governmental activity determines what level of government intrusion is reasonable. In *ILGWU v. Sureck,* 681 F.2d 624 (9th Cir.1982), the Ninth Circuit held that if a government agent's conduct during search or interrogation constitutes a seizure, then the agent must articulate objective facts and rational inferences from those facts to support a reasonable suspicion that each questioned person is an alien illegally in this country.[1] If the INS agents conduct, during farm housing searches, constitutes seizure, then the agents must have such individualized suspicion. I must now determine whether the conduct which is at issue here constitutes a seizure.

The Ninth Circuit test to determine whether the factual circumstances of law enforcement activity rise to the level of a seizure under the Fourth Amendment is found in *United States v. Anderson,* 663 F.2d 934, 939 (9th Cir.1981):

A person has been "seized" within the meaning of the Fourth Amendment only

---

[1]. Judge Anderson's opinion in *Sureck* contains a thorough analysis of the law applicable to the substantive issues in this case.

if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.

In *Sureck,* the Court concluded that the activity of INS agents resulted in a seizure of the workforce of a factory because all of the workers would have believed that they were not free to leave. The facts of this case relating to the circumstances of the searches are more aggravated than the facts in *Sureck.* The practices in this case resulted in the seizure of residents.

█ When such a seizure occurs, the agents must have an individualized suspicion, which is supported by articulable objective facts, that each person who is seized is an alien illegally in this country. Generalized suspicion, anonymous telephone calls, the fact that illegal aliens were located in a given housing area before, or the fact that the agents happen to be in proximity to a housing area, do not meet that standard.

█ Defendants contend that the searches and seizures reflected by the evidence in this case can be justified on the basis of consent. It is well established that a search conducted pursuant to a valid consent is constitutionally permissible. *United States v. Henry,* 615 F.2d 1223 (9th Cir. 1980). The voluntariness of a consent is determined from the "totality of all the circumstances." *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). The government has the burden of proving that the consent was freely given and was not the result of duress or coercion. *Schneckloth* at 223, 93 S.Ct. at 2045. If a resident has already been seized, his consent to a seizure is meaningless. The INS agents in this case did not advise residents of any right to refuse either interrogation or searches of their residences. Most of the residents of the camps know only the culture of their native Mexico, and they have an inherent fear of uniformed officers. Their limited education and lingual abilities, coupled with

the knowledge of the power which INS has in dealing with them places them in a much more disadvantageous position than the average citizen. Consequently, the argument of the defendants that they receive "voluntary consent" (as required by INS policy) is not persuasive. Several of the incidents developed by the testimony factually support this conclusion. The circumstances are further aggravated when surprise searches are conducted in darkness or at sunrise when most residents are awakened by the agents.[2]

Farm and ranch checks conducted without a warrant or court order may also violate the Attorney General's memorandum of January 13, 1981 which directed INS to "Restrict searches of residences to routine casework or searches authorized by warrant or court order." The INS contends that this restriction does not apply to residences of farm laborers located at or near the place of employment. Such a distinction is not only a strained interpretation of the Attorney General's directive, but, more importantly, it is not supported by a constitutional analysis. The Fourth Amendment protects the expectation of privacy in the home whether it be in the city or on a farm. *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967). The physical location of a home does not diminish a person's expectation of privacy in that home. A seizure of an entire workplace is also subject to the requirements of individualized suspicion. *Sureck, supra.*

The evidence presented in this case establishes that the farm and ranch checks conducted in farm labor housing units resulted in the seizure of the residents of the housing without individualized suspicion of illegal alienage. These objectionable procedures were discontinued in 1979, and have not been resumed. Therefore, I must address the mootness issue.

The test for determining when a case is moot was succinctly stated by the Supreme Court in *Powell v. McCormack,* 395 U.S.

---

**2.** For a discussion of the voluntary cooperation theory advanced by INS, see *Marquez v. Kiley,*

436 F.Supp. 100, 113–114 (S.D.N.Y.1977).

486, 496, 89 S.Ct. 1944, 1950, 23 L.Ed.2d 491 (1969).

> Simply stated, a case is moot when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.

A case has become moot during the pendency of litigation when

> (1) it can be said with assurance that "there is no reasonable expectation . . ." that the alleged violation will recur,
>
> (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.

*County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979) (citations omitted). When both conditions are satisfied the case is moot because neither party has the required "legally cognizable interest" in the final determination of the issues raised in the case.

The burden of demonstrating mootness, which the defendants bear, is "a heavy one." *United States v. W.T. Grant Co.,* 345 U.S. 629, 632–633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953).

The defendants contend that there is no reasonable expectation that the Fourth Amendment violations will recur because farm and ranch checks have not been resumed within the Spokane Sector and the INS national policy is to concentrate enforcement activities on places of employment. Voluntary cessation of activity during pendency of a lawsuit challenging such activity does not assure that the challenged activity will not be resumed. *Lankford v. Gelston,* 364 F.2d 197 (4th Cir.1966). The national policy of the INS to treat farm labor housing as a place of employment and to proceed without a warrant or court order, coupled with the evidence that such unlawful procedures have continued in other jurisdictions, support the conclusion that the alleged violations may recur. Therefore, the first condition has not been satisfied and there is no need to discuss the second. I have concluded that the case is not moot.

## THE BALANCE OF EQUITIES FAVOR INJUNCTIVE RELIEF

Plaintiffs have demonstrated that the balance of equities favor injunctive relief. Plaintiffs have no adequate remedy at law because the available damage remedies are inadequate. The victims of such activities are, as a class, one of the most powerless groups of people in our country. To conclude that these people have an adequate remedy at law, such as a civil suit for damages, is to close one's eyes to reality.

This has been a long and troublesome case. There have been periods of time during this litigation when it appeared that the objectionable conduct would terminate without risk that it would surface in the future. The most recent policies promulgated by INS and its interpretation of the Attorney General's guidelines do not support that conclusion. I recognize that the INS has a difficult assignment in discharging its duty to seek out illegal aliens and deal with them in accordance with the congressional mandate. However, as Justice White commented some years ago on INS enforcement practices which seek to contain the flow of illegal aliens into this country:

> The entire system, however, has been notably unsuccessful in deterring or stemming this heavy flow; and its costs, including added burdens on the courts, have been substantial. *Perhaps the Judiciary should not strain to accommodate the requirements of the Fourth Amendment to the needs of a system which at best can demonstrate only minimal effectiveness as long as it is lawful for business firms and others to employ aliens who are illegally in the country.*

Concurring opinion of Justice White, joined by Justice Blackman in *United States v. Brignoni-Ponce,* 422 U.S. 873, 914–915, 95 S.Ct. 2574, 2597–2598, 45 L.Ed.2d 607 and in *United States v. Ortiz,* 422 U.S. 891, 914–915, 95 S.Ct. 2585, 2597–2598, 45 L.Ed.2d 623 (1975) (emphasis added). The practices of the INS are well established and existed over a long period of time. The only adequate remedy which will protect the rights of the plaintiffs is an injunction.

This memorandum constitutes the Findings of Fact and Conclusions of Law, Rule 52(a), Federal Rules of Civil Procedure.

### AMENDED INJUNCTION

Pursuant to the Memorandum Decision of this date, defendants and those acting pursuant to defendants' instructions or in concert with them are enjoined and restrained from:

(a) entering dwelling units of farm labor housing in the Spokane sector unless they possess a valid warrant to search or arrest or have probable cause to enter without such warrant; [1]

(b) arresting persons who reside in farm labor housing unless they possess a valid warrant to search or arrest such person or have probable cause to search or arrest such person without a warrant;

(c) stopping, detaining, and interrogating by force, threats of force or a command based upon official authority, plaintiffs or persons who reside in farm labor housing, unless they possess a valid warrant to search or arrest such person, have probable cause to search or arrest such person without a warrant, or have reasonable suspicion based on specific articulable facts that such person is an alien unlawfully in the United States; provided, however, that defendants and those acting pursuant to defendants' instructions or in concert with them are not enjoined or restrained from interrogating a person, without detention, concerning the person's right to be in the United States if they reasonably believe the person to be an alien.

The INS shall notify its enforcement officers of the contents of this Injunction and a copy hereof shall be posted in each INS or Border Patrol office in this District.

IT IS SO ORDERED.

---

1. This provision is not intended to prohibit clearly consensual entries such as those made for the purpose of gathering an arrested alien's belongings.