Pete NICACIO, Ramiro Lopez, Arnold Ramirez, Margie Martinez, Julio Martinez, Simon Gaytan, and Marcos Herrera, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

UNITED STATES IMMIGRATION AND NATURALIZATION SERVICE, Allen Nelson, individually and in his official capacity as the National Commissioner of the INS; James Turnage, individually, and in his official capacity as District Director of the INS for the State of Washington; William T. Carty, individually and in his official capacity as Officer in charge of the Spokane substation of the INS; Andrew Hattery, individually and in his official capacity as Officer in charge of the Blaine INS office, Kenneth Langford, individually and in his official capacity as Chief Border Patrol Agent for the Spokane sector; Marshall Metzger, individually and in his official capacity as Chief Border Patrol Agent of the Blaine sector, border patrol agents Roy C. Johnson, Wayne T. Myhre, Johnny L. Minyard, Rodney L. Stenslie, Roy Sutton, Warren Goodwin and Does One through Twenty, individually and in their official capacity; All successors in office to the above named defendants, Defendants.

No. C–82–1018 RJM.

United States District Court, E.D. Washington.

April 18, 1984.

Supplemental Opinion Aug. 31, 1984.

Victor H. Lara, Daniel G. Ford, Thomas B. Benjamin, Evergreen Legal Services, Farm Workers Division, Sunnyside, Wash., for plaintiffs.

John Lamp, U.S. Atty., Carroll Gray, Wm. Beatty, Asst. U.S. Attys., Spokane, Wash., for defendants.

## MEMORANDUM DECISION

ROBERT J. McNICHOLS, Chief Judge.

This case presents yet another challenge to the constitutionality of the methods used by the Immigration and Naturalization Service (INS) in its efforts to enforce this nation's immigration laws. Plaintiffs, on behalf of their class, contend that the practices and policies of the Border Patrol Agents and criminal investigators of the INS in conducting motor vehicle stops are violative of the Fourth Amendment right to be free from unreasonable searches and seizures. Plaintiffs seek injunctive and declaratory relief to enjoin defendants from unlawfully stopping, detaining, and interrogating members of the plaintiff class, and to declare defendants actions in conducting these stops to be unlawful. In addition, plaintiffs seek compensatory and punitive damages against all defendants other than the defendant INS. In response to plain-

tiffs' claims, defendants maintain that the practices of the INS and its agents do not violate the constitutional rights of the plaintiff class, and further contend that the individual defendants are immune from liability under *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

*Background*

The challenged conduct by the government agents occurred primarily in the central part of the State of Washington. This area is devoted substantially to agricultural activities which, by their nature, require extensive employment of field labor. The labor force is composed mostly of persons of Hispanic appearance and Mexican heritage. The force is a mixture of United States citizens, legal aliens and illegal aliens.[1]

The evidence indicates that there are approximately 25,000 Hispanic people in the Yakima area, the great majority of which are citizens or documented aliens. The number of illegal aliens apparently fluctuates.

During the periods when the labor requirements are the greatest, substantial numbers of field workers of Hispanic appearance are traveling the roads and highways of central Washington. As one might expect, they are dressed in work clothes and normally drive older and less expensive automobiles.

The INS in its efforts to discharge its lawful duty engages in various efforts to locate and apprehend illegal aliens. During certain hours of the day these efforts include the stopping of automobiles on the highway and interrogating the occupants. It is the lawfulness of these stops which is at issue here.

## I. FACTS

The seven individual plaintiffs are United States citizens of Mexican descent, or permanent resident aliens of Mexican origin who reside in the Spokane Sector.[2] Plaintiff class has been defined as:

All persons of Mexican, Latin, or Hispanic appearance who have been, are, or will be traveling by motor vehicle on the highways of the State of Washington.

In addition to the defendant INS, the following persons are named as defendants in their individual and official capacities:

1. Allen Nelson, National Commissioner of the INS;
2. James Turnage, District Director of the INS for the State of Washington;
3. William T. Carty, Officer in charge of the Spokane substation of the INS;
4. Andrew Hattery, Officer in charge of the Blaine INS office;
5. Kenneth Langford, Chief Border Patrol agent for the Spokane Sector;
6. Marshall Metzger, Chief Border Patrol agent for the Blaine Sector; and
7. Border Patrol Agents Roy C. Johnson, Wayne T. Myhre, Johnny L. Minyard, Rodney L. Stenslie, Roy Sutton, and Warren Goodwin.

The record reflects that at the time this litigation was initiated, INS agents were regularly conducting roving patrol motor vehicle stops, detentions and interrogations in the Yakima Valley area of the Spokane Sector. Many of the stops were based solely on Hispanic appearance, or the agents' subjective feelings or intuition, or the suspected illegal aliens' innocuous behavior or appearance traits.

Persons stopped were required in most cases to provide identification or documentation of legal presence in the United States. Defendants keep no record of automobile stops in which no illegal aliens are apprehended.

## II. LEGAL STANDARD OF REVIEW

The issue before this Court is whether the stops in question comply with

---

1. The apprehension efforts of the INS are more concentrated during the seasons when the need for labor is the greatest since it is during those periods that the number of illegal aliens in the area increases.

2. The Spokane Sector is comprised of the Eastern District of Washington, a portion of Northern Idaho, and a portion of Western Montana.

**22**

Fourth Amendment mandates. The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." The focus in the area of Fourth Amendment law is the "reasonableness" of the governmental intrusion involved. *Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979); *see also United States v. Martinez-Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). The reasonableness of a particular law enforcement practice is judged by considering all the circumstances, and balancing the intrusion on the individual's privacy against the promotion of legitimate government interests. *Delaware v. Prouse,* 440 U.S. at 654, 99 S.Ct. at 1396; *Terry v. Ohio,* 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968). *See also United States v. Mendez-Jimenez,* 709 F.2d 1300, 1302 (9th Cir.1983).

█ The threshold inquiry is whether the factual circumstances of the law enforcement activity give rise to the level of a "seizure" under the Fourth Amendment. The Ninth Circuit has held that a person is seized within the meaning of the Fourth Amendment when "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Anderson,* 663 F.2d 934, 939 (9th Cir.1981). There is little doubt that the stopping of a vehicle and the detention of its occupants constitutes a "seizure" of those persons. *See United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981); *Delaware v. Prouse,* 440 U.S. at 653, 99 S.Ct. at 1395; *United States v. Brignoni-Ponce,* 422 U.S. at 878, 95 S.Ct. at 2578.

Having determined that the stops in question constituted "seizures" within the meaning of the Fourth Amendment, this Court must decide whether the conduct which is at issue here violates the plaintiffs' constitutional rights. Individuals in automobiles travelling on this nation's highways may not for that reason alone have their travel and privacy interfered with at the unbridled discretion of law enforcement officials. *Delaware v. Prouse,* 440 U.S. at 663, 99 S.Ct. at 1401.

*United States v. Brignoni-Ponce* provides the governing standard for this case:

... officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country.

*United States v. Brignoni-Ponce,* 422 U.S. at 884, 95 S.Ct. at 2582.

█ Courts have used various terms to describe the elusive concept of what is sufficient to authorize law enforcement officials to conduct an automobile stop. Terms such as "articulable reasons," "articulable facts" or "reasonable suspicion" fall short of providing clear guidance dispositive of the factual situations which may arise. In the area of roving patrol stops, the Fourth Amendment requires more than the broad discretion sought by the INS. *See United States v. Brignoni-Ponce,* 422 U.S. at 882, 95 S.Ct. at 2580. Rather, the detaining officers must have a particularized and *objective* basis for suspecting the particular person stopped to be an illegal alien. *See, e.g., United States v. Brignoni-Ponce,* 422 U.S. at 884–85, 95 S.Ct. at 2581–82. Border Patrol officers may not lawfully stop motorists for questioning on a roving patrol without reason to believe that a particular vehicle is carrying illegal aliens. The articulable fact standard is "measured against an objective reasonable man standard, not by the subjective impressions of the particular officer." *United States v. Rocha-Lopez,* 527 F.2d 476, 477 (9th Cir. 1976).

█ The Supreme Court in *Brignoni-Ponce* made clear that a roving patrol may not stop a vehicle in an area near the border and question its occupants when the only ground for stopping the vehicle is that the occupants appear to be of Mexican an-

cestry. *United States v. Brignoni-Ponce*, 422 U.S. at 886, 95 S.Ct. at 2582. The Court enumerated other factors however, along with Mexican appearance, which may justify a stop. These factors include: characteristics of the area; information about recent illegal border crossings; the driver's behavior such as erratic driving and obvious attempts to evade; and characteristics of the vehicle that would indicate the vehicle is transporting concealed aliens. *United States v. Brignoni-Ponce*, 422 U.S. at 883–84, 95 S.Ct. at 2581–82.

## III. DEFENDANTS' CONDUCT VIOLATED FOURTH AMENDMENT

The plaintiffs' evidence establishes that many vehicles were stopped on the highways by INS agents under circumstances in which the occupants were of Hispanic appearance, dressed in work clothes and operating older automobiles. In most instances these stops were made during the active labor season at the time of day when the field workers would be going to or from work. In the numerous instances reflected by the evidence, all of the occupants of the vehicles were either U.S. citizens or documented aliens. The witnesses testified that they knew of no reason for being stopped other than perhaps their appearance.

INS was unable to present testimony of any of the agents who made the stops.[3] Since the INS keeps no record of automobile stops which do not result in the apprehension of illegal aliens, this may be understandable. Nevertheless, the Court is left with undisputed testimony which indicates that numerous stops were made solely because of the Hispanic appearance of the occupants, the type of automobile and/or the time of day and year. I carefully observed the witnesses as they testified and am completely satisfied that they were being honest and candid in their testimony and sincerely believed that they were stopped solely because of the factors indicated. In order to give the Government the opportunity to meet this evidence, I

permitted the testimony of certain INS officials who had no knowledge of the circumstances of any particular stop. These witnesses indicated their belief that 90% of the automobile stops result in the arrest of illegal aliens. They also speculated as to the reasons for some of the stops to which plaintiffs' witnesses testified.

The testimony of the officers indicated that appearance and dress factors such as a "lean and hungry look," an "unclean, unkept appearance," "old clothes," and "work clothes," were taken into account in determining whether to stop a vehicle suspected of containing illegal aliens. Furthermore, vehicles that were "riding high," "riding low" and "standard model Fords, Plymouths, Chevys 6–8 years old" were considered suspect by the INS agents. Finally, behavioral factors such as "avoiding eye contact, staring straight ahead," or a "blank look" and similar factors were considered in making a stop.

■ Based on all of the evidence, I have concluded that the INS, during the period in question at least, followed a practice of stopping vehicles on the highway without adequate articulable facts to form a reasonable suspicion that occupants of the vehicles were illegal aliens. These stops were conducted in a manner violative of the Fourth Amendment.

A vital element of the *Brignoni-Ponce* test is whether the agents had reason to believe that the vehicle in question had come from the border. *United States v. Brignoni-Ponce*, 422 U.S. at 885–86, 95 S.Ct. at 2582–83; *United States v. Torres-Urena*, 513 F.2d 540, 542 (9th Cir.1975). There is no contention that the stops in issue here are border stops. Thus, factors such as "heavily loaded vehicles," or vehicles with an extraordinary number of passengers," or "vehicles riding low" should receive little or no consideration in an agents' decision to stop a vehicle in a non-border area, absent some other articulable facts to support the decision to stop.

**3.** Except for one stop which occurred in the Blaine Sector in Northwestern Washington.

Furthermore, subjective behavioral factors such, as "avoiding eye contact," a "blank look," and similar factors are not within the meaning of *Brignoni-Ponce*. The driver's behavior may be relevant, but only objective articulable factors such as obvious attempts to evade the officers, or independent information concerning a certain vehicle or its occupants, can support a reasonable suspicion. *United States v. Brignoni-Ponce*, 422 U.S. at 885, 95 S.Ct. at 2582. Failure to make eye contact with law enforcement officers may be the norm rather than the exception. In any case, persons of Mexican appearance are faced with a no win situation; they may be stopped by the INS if they look at the officers or if they do not look at the officers. Indeed, they may be stopped if they have no "look" at all. Absent something more, such factors do not constitute "articulable facts."

Similarly, appearance and dress characteristics considered by the INS could apply to any United States citizen or lawful permanent resident alien. These factors are not determinative of the question of whether the person stopped is an illegal alien. Rather, these factors are a function of the individuals socioeconomic status, and may not be considered by the INS absent other objective facts supporting the decision to stop a vehicle on the highway and interrogate its occupants.

Thus, if the INS has a reasonable and articulable suspicion that the vehicle contains illegal aliens, based on objective factors such as erratic driving, obvious attempts to evade, or specific information about the vehicle or its occupants, the agents may stop the vehicle. The present subjective factors relied on by the agents of the INS however, constitute an insufficient basis for a reasonable suspicion that the vehicles stopped contain illegal aliens. Persons travelling in automobiles may not be subjected to stops based on such arbitrary and subjective factors.

4. The concurring opinions applied equally in *United States v. Brignoni-Ponce*, 422 U.S. 873, 95

## IV. INJUNCTIVE OR DECLARATORY RELIEF

The plaintiffs contend that only injunctive relief will protect the rights of the plaintiffs and the members of the class. The INS, on the other hand, argues that an injunction would have such a chilling effect upon its agents that the difficult task which they now face in enforcing the laws would become almost impossible.

The problems generated by the massive influx of illegal aliens into this country cannot be minimized. The solution however, cannot be legitimately achieved by diluting the constitutional rights of our citizens to be free of unreasonable searches and seizure. The concurring opinions of the Chief Justice and Mr. Justice White (both joined by Justice Blackmun) in *United States v. Ortiz*, 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975)[4] demonstrate the frustration of the judiciary in dealing with this problem.

Considering the extreme difficulty which the courts encounter in determining the legality or illegality of searches and seizures after the fact, how does one structure a workable injunction to govern law enforcement officers in the field before the fact? I have in mind the injunction issued by this Court in *LaDuke v. Nelson*, 560 F.Supp. 158 (E.D.Wa.1982). However, it is one thing to delineate the criteria for justifying the search of a home and quite another to do so with respect to automobiles. *Chambers v. Maroney*, 399 U.S. 42, 52, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970); *Carroll v. United States*, 267 U.S. 132, 151, 45 S.Ct. 280, 284, 69 L.Ed. 543 (1925).

■ It strikes me that the better approach in this case would be for the Court to enter an order clarifying to the extent feasible, the considerations which must prevail before the officers may stop vehicles on the highway and to require the INS to keep appropriate records of each incident,

S.Ct. 2574, 45 L.Ed.2d 607 (1975).

and specifically include in such record the factual basis which gives rise to the reasonable suspicion. I believe that it is appropriate for the Court to conclude that Government officials will abide by such a decree and perform their duties in a lawful manner.

## V. DAMAGES

The named plaintiffs in this action seek damages from supervisory officials as well as Border Patrol officers who conducted the stops. Plaintiffs contend that the supervisors are personally liable for failure to train and supervise their agents regarding the permissible "articulable facts" to consider in making a vehicle stop.

 However, government officials performing discretionary functions are shielded from liability for civil damages if their conduct does not violate clearly established constitutional rights. *Procunier v. Navarette*, 434 U.S. 555, 565, 98 S.Ct. 855, 861, 55 L.Ed.2d 24 (1978). The legal standard for governmental immunity is set forth by the Supreme Court in *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2739, 73 L.Ed.2d 396 (1982):

> If the law at that time was not clearly established an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful.

*Id.* The Court then went on to say:

> Where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken 'with independence and without fear of consequences.' "

*Id.* at 819, 102 S.Ct. at 2739.

In reviewing the cases in this Circuit and others applying the *Brignoni-Ponce* standard, I find it somewhat difficult to determine precisely where the "reasonable suspicion" or "articulable facts" line has been drawn.

 It is necessary therefore to attempt to apply the principles established by *Harlow* to the circumstances which the INS officers face under the facts of this case. In my judgment, the rights of citizens to travel upon the public highways without unreasonable interference have been clearly established. However, the clarity of the law governing interference with such travel is another matter. The supervisory personnel of the INS did instruct the field officers that highway stops must be based on articulable facts. Although they used some examples which I have concluded were too subjective, I believe it would be unjust to hold them responsible for money damages on the theory that they failed to train or supervise their subordinates in an adequate manner. A contrary ruling would run afoul of the underlying reasoning of *Harlow*.

With respect to the agents who actually stopped the plaintiffs, none have been identified except for agent Eugene Davis. The only stop attributed to him was not unreasonable. He clearly had the requisite facts to give rise to a reasonable suspicion.

It is therefore my conclusion that neither the agents who made the stops nor the supervisory personnel of the INS should be held individually liable for damages as a result of the unlawful stops heretofore made.

## SUMMARY

The court therefore reaches the following conclusions:

1. The actions of the government officers in stopping and interrogating the plaintiffs and the members of the class who may have been similarly stopped were unlawful.

2. The plaintiffs and the members of the class are entitled to a declaratory judgment governing future conduct of the government agents in stopping vehicles upon the public highways.

3. A declaratory judgment is more appropriate under all of the circumstances than an injunction.

4. The individual plaintiffs are not entitled to recover damages against the individual defendants.

Counsel shall confer with respect to further proceedings concerning attorneys fees and costs.

This memorandum decision shall constitute the findings of fact and conclusions of law pursuant to Rule 52(a), Federal Rules of Civil Procedure.

IT IS SO ORDERED.

## DECLARATORY JUDGMENT

The Court having heretofore issued its Memorandum Decision, findings of fact and conclusions of law,

1. IT IS HEREBY ORDERED:

It is unlawful for the United States Immigration and Naturalization Service, its agents and employees and Border Patrol agents: To stop, detain, and interrogate persons of Hispanic appearance travelling by motor vehicle on the highways of the State of Washington without a valid search or arrest warrant, or unless they have a particularized reasonable suspicion based on specific articulable facts and rational inferences therefrom that the occupant of a vehicle is an alien unlawfully in the United States. Further, these specific articulable facts justifying the motor vehicle stops must be based upon particularized objective factors, and not solely upon the agents' individual subjective impressions.

2. IT IS FURTHER ORDERED that the United States Immigration and Naturalization Service, its agents and employees and Border Patrol agents: Shall not stop, detain, and interrogate persons of Hispanic appearance travelling by motor vehicle on the roadways of the State of Washington without documenting in writing the specific articulable facts on which defendants base their particularized reasonable suspicion for stopping, detaining and interrogating these per-

sons. Defendants shall maintain this documentation for a period of not less than three years.

Copies of this Judgment shall be posted in the various INS and Border Patrol offices within the region and the supervisory personnel of INS shall proceed forthwith to implement the provisions of this Judgment.

## SUPPLEMENTAL OPINION

In view of the recent Supreme Court decision in *Immigration and Naturalization Service v. Delgado*, —— U.S. ——, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984), the Memorandum Decision of April 17, 1984, is hereby supplemented as follows.

In *Delgado*, the Immigration and Naturalization Service (INS) acting pursuant to warrants, conducted a "factory survey" of the work force of Southern California Davis Pleating Company in search of illegal aliens. During the survey, INS agents were positioned near the factory exits, while other agents moved about the factory questioning most employees about their citizenship. If the officers were satisfied that the employee being questioned was a United States citizen, the questioning ended, and the agent moved on to another employee. At all times, the employees were free to walk around the factory and continue their work.

The Supreme Court held that these factory searches did not result in the seizure of the entire work force, despite the fact that the INS placed agents near the exits of the factory. 104 S.Ct. at 1763. The Court noted that while the surveys may have caused some disruption, the workers were free to move about the factory and continue their business. *Id.* Thus, the Court reasoned that "since most workers could have had no reasonable fear that they would be detained upon leaving, we conclude that the work forces as a whole were not seized." 104 S.Ct. at 1764.[1]

---

1. The Court stated that a person is not "seized" within the meaning of the Fourth Amendment "[u]nless the circumstances of the encounter are so intimidating as to demonstrate that a reason-

able person would have believed he was not free to leave if he had not responded . . . ." 104 S.Ct. 1763.

The Supreme Court's ruling in *Delgado* is distinguishable from the facts of the instant case. Here, the INS was stopping automobiles on the highway, and detaining and interrogating the occupants. No warrants were sought or obtained. The INS officers were in uniform; the vehicles were marked, and in most instances, flashing blue strobe lights were activated to alert the driver of the vehicle to stop. There is little doubt that the stopping of a vehicle and the detention of its occupants constitutes a "seizure" of those persons within the meaning of the Fourth Amendment. *See United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981); *Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 1395, 59 L.Ed.2d 660 (1979); *United States v. Brognoni-Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975).

Unlike the persons questioned in *Delgado,* the occupants of the vehicles in this case not only felt that they were not free to leave, but in fact were not free to leave until so advised by the officers. They were seized within the meaning of the Fourth Amendment.

IT IS SO ORDERED.