Pedro CERVANTES–CUEVAS,
Petitioner,

v.

IMMIGRATION & NATURALIZATION
SERVICE, Respondent.

No. 84–7592.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 6, 1985.

Decided Dec. 10, 1985.

Paul D. Edmondson, Yakima, Wash., for petitioner.

Thomas W. Hussey, David V. Bernal and Joan E. Smiley, Dept. of Justice, Washington, D.C., for respondent.

Before WRIGHT, PREGERSON, and ALARCON, Circuit Judges.

ALARCON, Circuit Judge.

Petitioner Pedro Cervantes-Cuevas seeks review of the decision of an immigration judge, affirmed by the Board of Immigration Appeals, finding petitioner deportable under 8 U.S.C. § 1251(a)(2) for entry without inspection. This court has jurisdiction under 8 U.S.C. § 1105a(a). Reversal is sought on the ground that the immigration judge erred in denying petitioner's motion to suppress evidence of the statements he made following his detention by agents of the United States Border Patrol. We affirm.

## I. PERTINENT FACTS

At the time of the hearing before the immigration judge, petitioner was a 38 year-old married male alien, who was a citizen of Mexico. He entered the United States from Mexico during April of 1977, without submitting himself for inspection.

Petitioner was detained and subsequently arrested on March 18, 1982. Prior to being detained, petitioner was driving on Highway 12, near Wapato, Washington during a time when the United States Border Patrol was engaged in an operation checking establishments and places where undocumented aliens were likely to congregate. This operation was based upon reports received from informants, Border Patrol agents, and local law enforcement officers that the Wapato area of the Yakima Valley was "highly populated" with undocumented aliens from Mexico. In addition, in the course of their investigation, the Border Patrol agents had observed that when officers in marked vehicles approached housing which contained illegal aliens, some persons in the vicinity would leave in motor vehicles. Information concerning the fact that such persons had departed was relayed over the radio by surveillance officers in unmarked cars to agents who would detain persons who stopped their cars and fled on foot or appeared to speed up after passing Border Patrol vehicles. Approximately 500 undocumented aliens were arrested by the Border Patrol in the Yakima Valley during the week that petitioner was detained and then arrested.

The uncontradicted evidence showed that as the petitioner approached a Border Patrol vehicle parked next to a pick-up truck, he slowed to ten miles per hour, and then speeded up to forty-five miles per hour. Petitioner was followed by a Border Patrol vehicle. He stopped his car when the flashing lights were turned on.

After the petitioner was stopped, he was asked to show any documents establishing that he was lawfully in the United States. Instead of complying with this request, the petitioner handed the agents a G–28 Notice of Appearance of Attorney. The petitioner was then arrested. In a later conversation with an agent of the Border Patrol, the petitioner stated that he originally entered the United States from Mexico without inspection. These statements were included in a Form I–213 report.

In his motion to suppress his statements, petitioner contended that the detention and arrest was unlawful because of the "lack of specific, articulable facts supporting respondent's arrest, interrogation and confinement in jail pursuant to *U.S. v. Brignoni-Ponce*, 422 U.S. 873, 878, [95 S.Ct. 2574, 2578, 45 L.Ed.2d 607] (1975)."

Petitioner made no contention before the immigration judge that the agent's conduct was "egregious" or that his statements were coerced, made under duress, or were otherwise involuntary.

Petitioner submitted an affidavit in support of his motion to suppress the statements obtained following his arrest containing the following allegations: As he was driving to work on Highway 12 at 6:45 a.m. on March 18, 1982, petitioner saw a stalled pickup truck on the roadway. He slowed his vehicle to 10 miles per hour to go around the truck. He observed a Border Patrol vehicle behind the pick-up truck. He did not turn his head to look at the Border Patrol vehicle. He resumed his speed of forty-five miles per hour.

The immigration judge concluded that an experienced Border Patrol agent would reasonably suspect that the petitioner was an alien based on the following facts: (1) other agents and local law enforcement officers had reported through official channels that many undocumented aliens were leaving the buildings in the area of the arrest; (2) some aliens were fleeing their housing in the area in automobiles as others were approached or being questioned; and (3) the petitioner's car slowed down and then increased its speed as it drove away after observing a Border Patrol vehicle stopped behind a pick-up truck. Because it was his view that the record contained sufficient articulable facts to warrant stopping the petitioner to determine whether he was an alien and if he was lawfully in the United States, the immigration judge concluded that the arrest was lawful.

Petitioner filed a timely appeal with the Board of Immigration Appeals (hereinafter the Board). Petitioner's notice of appeal to the Board stated that the arrest was illegal in that the Border Patrol agents had violated the decision of the Supreme Court in *Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). He did not contend that the conduct of the Border Patrol agents was "egregious" or that his statement was made involuntarily. The Board concluded that the arrest was lawful because the record contained sufficient articulable facts to support a reasonable suspicion that the petitioner was an undocumented alien prior to his detention, as required by *Brignoni-Ponce*. Petitioner's appeal was dismissed by the Board.

## II. ISSUES ON APPEAL

The issues presented by this appeal can be summarized as follows:

One. Prior to directing petitioner to stop his vehicle, were the Border Patrol agents aware of specific, articulable facts that warranted a reasonable suspicion that the car contained aliens illegally residing in the United States?

Two. Does the exclusionary rule apply to civil deportation proceedings where the record shows that there were no specific articulable facts to justify a reasonable suspicion, prior to detention, that the petitioner was an alien illegally in this country?

Three. Should the decision of the Supreme Court in *INS v. Lopez-Mendoza*, 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984) be applied retroactively to conduct of Border Patrol agents which occurred prior to its effective date?

Four. Was the probative value of the evidence obtained from the petitioner undermined by "egregious" conduct of the arresting officers?

## A. *Presence of Articulable Facts and Reasonable Suspicion*

The question of the appropriate standard of review applicable to the Board's finding that the Border Patrol agent had a founded suspicion for stopping petitioner is unclear in this circuit. *United States v. Magana*, 769 F.2d 549, 550–51 (9th Cir.1985). Like the panel in *Magana*, however, we need not decide whether findings of founded suspicion are reviewable under the clearly erroneous standard or receive de novo review; under either standard of review, petitioner's detention was based upon a founded suspicion of unlawful activity. *See id.* at 551.

Petitioner argues that the basis for the Border Patrol agent's belief that he was an illegal alien—his physical appearance and the fact that he slowed down upon approaching the pick-up truck and then continued on at a speed of forty-five miles per hour—was insufficient to justify his detention under *Brignoni-Ponce*. Although the facts selected by petitioner, standing alone, may not meet the Supreme Court's standards for a reasonable detention, *see Nicacio v. INS*, 768 F.2d 1133, 1137 (9th Cir.1985) ("Hispanic-looking appearance and presence in an area where illegal aliens frequently travel are not enough to justify a stop to interrogate the occupants of a vehicle"), resolution of this question is unnecessary. Petitioner has ig-

nored the facts articulated by the Border Patrol agent which were known to him prior to the detention. The record shows that at the time of petitioner's detention and arrest, agents of the Border Patrol were engaged in approaching and interrogating persons who resided in buildings in the Wapato area based on information from various sources, including official channels, that the area was "highly populated" by undocumented aliens from Mexico. The arresting officers were also aware that some of these aliens would flee from their housing units in automobiles to avoid interrogation by the officers engaged in their ongoing investigation, and that 500 undocumented aliens had been seized in that area during that week.

It was in light of these *additional* circumstances that the immigration judge and the Board concluded that the fact that a person who appeared to be an alien slowed down to ten miles an hour and then accelerated to a higher speed after passing a border patrol vehicle, constituted a sufficient objective basis for a reasonable suspicion that the car contained undocumented aliens. As the Supreme Court stated in *Brignoni-Ponce,* the test for lawful vehicle stops by roving patrols is awareness of "specific articulable facts, *together with rational inferences from those facts,* that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." 422 U.S. at 884, 95 S.Ct. at 2582 (footnote omitted) (emphasis added). We have noted that "[a]n agent's experience might make a situation suspicious to him which to the untrained or experienced eye would pass unnoticed or seem innocent." *Nicacio v. INS,* 768 F.2d at 1138–39; *see also Magana,* 769 F.2d at 553 (trained officers entitled to combine objective facts with permissible deductions to form legitimate basis for suspicion). In the instant case, the arresting agent was entitled to draw the inference that petitioner was an illegal alien fleeing from a housing unit in the Wapato area in order to avoid interrogation.

### B. *Application of Exclusionary Rule to An Unlawful Arrest*

██ We need not decide, however, if knowledge of these additional facts by an experienced Border Patrol agent meets the strictures of *Brignoni-Ponce.* We recently held in *Benitez-Mendez v. INS,* 760 F.2d 907 (9th Cir.1983) that in light of the Supreme Court's decision in *INS v. Lopez-Mendoza,* "even though ... petitioner's arrest violated the Fourth Amendment, the information obtained as the result of the arrest (petitioner's statements on Form I–213) was admissible at his deportation hearing." 760 F.2d at 910. Thus, our holding in *Benitez-Mendez* compels us to rule in the instant matter that petitioner's statements were admissible even if we assume that the detention of the petitioner was not based on specific articulable facts or reasonable suspicion.

### C. *Retroactivity of INS v. Lopez-Mendoza*

██ Petitioner apparently argues that the Supreme Court's decision in *Lopez-Mendoza* cannot be applied retroactively. This argument is meritless. In *Benitez-Mendez* we applied the Supreme Court's decision in *Lopez-Mendoza* (decided July 5, 1985) to an arrest that occurred on April 13, 1981, *Benitez-Mendez,* 760 F.2d at 908–10.

### D. *Alleged Egregious Conduct.*

Petitioner asserts that "an egregious violation of the *Brignoni* standards has occurred in that no specific articulable facts have been proven to justify petitioner's detention." Petitioner offers no authority for the novel proposition that the mere failure to articulate specific facts to justify a detention is "egregious" conduct requiring suppression of evidence in a civil deportation proceeding. It is quite true that the Supreme Court left open the question whether the exclusionary rule would apply to "egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness *and undermine the probative value of the evi-*

dence obtained." *Lopez-Mendoza,* 104 S.Ct. at 3490 (emphasis added). Petitioner has neither argued nor attempted to demonstrate that the conduct of the Border Patrol agents in this matter in any way undermined the probative value of petitioner's statements. No evidence was offered that the statements were made involuntarily, or were the product of duress or coercion. In *Lopez-Mendoza,* the Supreme Court held that the exclusionary rule does not apply in civil deportation proceedings to evidence gathered in connection with a "peaceful arrest" which violated the Fourth Amendment. *Id.* at 3490–91.

▆ In the absence of some proof casting doubt on the probative value of voluntary statements following an illegal detention, evidence that the arrest was unlawful does not affect the admissibility of an undocumented alien's statements.

**CONCLUSION**

Petitioner has failed to demonstrate that his statements were obtained by Border Patrol agents in a manner which casts doubt on their probative value. Accordingly, his post-detention statements were admissible. The motion to suppress was properly denied because the exclusionary rule is inapplicable in civil deportation proceedings in the absence of any showing that the officer's conduct would undermine the credibility of the challenged evidence.

AFFIRMED.

PREGERSON, Judge, dissenting.

I dissent. I believe that the evidence on which the Border Patrol relied in detaining Cervantes-Cuevas fails to meet the requirements of *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), and that the statements obtained from him as a result of an illegal detention must be excluded because of egregious governmental conduct.

**A.** *Absence of Articulable Facts and Reasonable Suspicion*

In *Brignoni-Ponce,* the Supreme Court held that roving Border Patrol agents must point to "specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion" that the vehicle they stop contains undocumented aliens. 422 U.S. at 884, 95 S.Ct. at 2582. The Court also held that Hispanic appearance, without more, is insufficient to justify an investigatory stop. *Id.* at 887, 95 S.Ct. at 2583. In *Nicacio v. INS,* 768 F.2d 1133, 1137 (9th Cir.1985), we said that *Brignoni-Ponce* and its progeny hold that Hispanic appearance and presence in an area frequented by illegal aliens do not justify an investigative stop.

I agree with the majority that in light of *Brignoni-Ponce* and *Nicacio,* the Hispanic appearance of Cervantes-Cuevas, the slowing of his automobile while approaching the Border Patrol vehicle parked behind a pickup truck, and his resuming normal speed after passing the vehicles are insufficient by themselves to justify his detention.

I part company with the majority, however, when it concludes that three other significant factors justify Cervantes-Cuevas's detention. The majority identifies these three "additional" factors as: (1) the agricultural area where the arrest took place was known through official channels to be "highly populated" by undocumented Mexican aliens; (2) the officers knew that some of these aliens would flee from their housing units in automobiles to avoid interrogation by agents investigating their status; and (3) Border Patrol agents had seized 500 undocumented aliens in the area that week. In my view, these additional factors provide little, if any, support for a finding of reasonable suspicion.

First, the presence of large numbers of undocumented aliens in the area is precisely the type of evidence that we found insufficient to justify a stop in *Nicacio,* 768 F.2d at 1137. Second, knowledge of the aliens' pattern of flight from housing units is irrelevant. Nothing in the record shows that any officer saw Cervantes-Cuevas flee from a housing unit. Indeed, Border Patrol Officer Anderson, who testified at the suppression hearing, could not even recall

specifically stopping Cervantes-Cuevas. By declining to disapprove of the BIA's reliance on this factor to justify the detention, the majority encourages INS stops of persons who appear to be Hispanic and who are found in an area populated by large numbers of undocumented aliens. This INS practice threatens the fourth amendment rights of countless persons of Hispanic ancestry who legally reside, work, and travel in many agricultural and urban communities throughout our circuit.

Third, by relying on the seizure of 500 undocumented aliens in the area that week, the Board of Immigration Appeals (BIA) and the majority apparently ignore the likelihood that a substantial number of those seizures were themselves illegal. Indeed, this court in *Nicacio* deemed illegal the 1982–83 arrests of a class of "[a]ll persons of Mexican, Latin, or Hispanic appearance who have been, are, or will be travelling by motor vehicle on Washington highways." 768 F.2d at 1135. Most of the arrests in *Nicacio* occurred around the town of Yakima, in the central part of Washington. *See Nicacio v. INS,* 595 F.Supp. 19, 21 (E.D. Wash.1984), *aff'd,* 768 F.2d at 1133. Although Cervantes-Cuevas is not a member of the class certified in *Nicacio,* he was arrested in 1982 in Yakima County. When, as here, the arresting officer admits not remembering the specific arrest, it is anomalous for the BIA and this court to hold that mass arrests resembling those recently disapproved in *Nicacio* contributed to reasonable suspicion. In sum, I believe that the "additional" facts upon which Agent Anderson relied were either irrelevant to this case or are insufficient to support reasonable suspicion.

### B. *Applicability of Exclusionary Rule*

As its author, I do not read *Benitez-Mendez v. INS,* 760 F.2d 907 (9th Cir.1985), *modifying,* 748 F.2d 539 (9th Cir.1984), *modifying,* 707 F.2d 1107 (9th Cir.1983), as requiring a ruling of admissibility of Cer-

vantes-Cuevas's statements. Benitez-Mendez did not argue that his arrest constituted an egregious violation of constitutional liberties. Moreover, the Border Patrol officer did not rely on Benitez-Mendez's Hispanic appearance to support his reasonable suspicion.

### C. *Egregious Conduct*

Further, the majority incorrectly concludes that: (1) Cervantes-Cuevas failed to show egregious conduct on the part of the Border Patrol; and (2) the Border Patrol's conduct must undermine the probative value of evidence illegally obtained before its exclusion is appropriate.

In *Adamson v. Commissioner,* 745 F.2d 541, 544–45 (9th Cir.1984), we applied *Lopez-Mendoza*'s "egregious violation" language.[1] We recognized there that a police officer's bad faith violation of a person's fourth amendment rights could amount to an egregious violation, warranting exclusion of evidence in a civil tax proceeding. *Adamson,* 745 F.2d at 546. Although in *Adamson* we found no bad faith, we did suggest that bad faith would be found if a reasonably competent officer would have believed the search to be illegal. *Id.* In this case, Cervantes-Cuevas essentially argues that a reasonably competent officer would have known that under *Brignoni-Ponce,* decided in 1975, Hispanic appearance alone does not justify a stop. Because I believe that the Border Patrol agent articulated no significant facts apart from those that are insufficient to justify detention under existing law, I would conclude that he did not act in good faith.

I further believe that we are not required to limit exclusion of evidence illegally obtained to instances where the government's egregious conduct in obtaining the evidence undermined its probative value. I thus disagree with the majority's reading of *Lopez-Mendoza* that undermined probative value

---

1. As the majority notes, the Supreme Court left open the question whether the exclusionary rule applies to "egregious violations of Fourth Amendment or other liberties that might trans-gress notions of fundamental fairness and undermine the probative value of the evidence obtained." *INS v. Lopez-Mendoza,* 104 S.Ct. 3479, 3490 (1984).

is a second requirement for the exclusion of evidence in civil proceedings.

In *Adamson* we implictly rejected the requirement that for the exclusionary rule to apply, the probative value of illegally obtained evidence must be underminded. There, we also suggested that an officer's bad faith violation of fourth amendment rights alone would constitute an egregious violation requiring exclusion of evidence illegally obtained. 745 F.2d at 546. We did not mention any requirement that an officer's bad faith must undermine the probative value of the illegally obtained evidence for the exclusionary rule to apply. The approach we took in *Adamson* is correct because requiring that the probative value of the illegally obtained statement be underminded would render admissible evidence obtained by even the most egregious means. For example, in *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), officers directed a doctor to induce Rochin to vomit in order to extract drug capsules from his stomach. The capsules, once extracted from Rochins's stomach, were highly probative evidence of his possession of contraband. *Id.* at 166, 72 S.Ct. at 206. Yet this is the very case the Supreme Court cited as support for the proposition that evidence obtained by an egregious violation of individual liberties may be excluded from civil proceedings. *Lopez-Mendoza,* 104 S.Ct. at 3490.[2]

It is hard to understand how requiring underminded probative value is consistent with the primary purpose of the exclusionary rule. The Supreme Court has noted that the rule's "prime purpose, if not the sole one," is to deter official misconduct. *Lopez-Mendoza,* 104 S.Ct. at 3486 (quoting *United States v. Calandra,* 414 U.S. 338, 347, 94 S.Ct. 613, 619, 38 L.Ed.2d 561 (1974)). If, in cases of bad faith violations of fourth amendment rights, courts exclude only illegally obtained evidence whose probative value is somehow underminded, then application of the rule would be narrowly limited and its deterrent effect on official misconduct would be minimal.

### D. *Conclusion*

For the foregoing reasons, I would conclude that insufficient articulable facts justified Cervantes-Cuevas's detention and that the Border Patrol's bad faith conduct in stopping and detaining Cervantes-Cuevas primarily because of his Hispanic appearance requires exclusion of his statements. The case should be remanded to the BIA to give the INS the opportunity to prove, without relying on Cervantes-Cuevas's statements, his deportability by clear and convincing evidence. *See Woodby v. INS,* 385 U.S. 276, 285–86, 87 S.Ct. 483, 487–88, 17 L.Ed.2d 362 (1966).

---

2. In *Adamson,* we also noted: "[a]lthough *Rochin* involved physical brutality that 'shocks the conscience,' we do not believe the *Lopez-Mendo-*za Court's citation to *Rochin* was meant to limit 'egregious violations' to those of physical brutality." 745 F.2d at 545 n. 1.