Mario GONZALEZ–RIVERA, Petitioner,

v.

IMMIGRATION & NATURALIZATION SERVICE, Respondent.

No. 92–70492.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 10, 1993.

Decided April 28, 1994.

Raul M. Montes, Armando M. Montes and Gilbert M. Montes, Montes, Montes & Montes, San Diego, CA, for petitioner.

David J. Kline, Office of Immigration Litigation, U.S. Dept. of Justice, Washington, DC, for respondent.

Before: CHOY, TANG, and D.W. NELSON, Circuit Judges.

Opinion by Judge D.W. NELSON; Concurrence by Senior Judge TANG, Partial Dissent by Judge CHOY.

D.W. NELSON, Circuit Judge:

## OVERVIEW

Mario Gonzalez–Rivera (Gonzalez) petitions this Court to review the Board of Immigration Appeal's (BIA) reversal of the decision by the Immigration Judge (IJ). The IJ found that the Border Patrol officers had stopped Gonzalez based solely on his Hispanic appearance in violation of the Fourth Amendment. The IJ further concluded that stopping Gonzalez solely because of his Hispanic appearance was a bad faith Fourth Amendment violation and consequently an egregious constitutional violation requiring suppression of the evidence obtained as a result of the stop. In reversing the IJ, the BIA ruled that the stop was based on a number of factors rather than solely on Gonzalez' Hispanic appearance, and, on this ba-

sis, concluded that no Fourth Amendment violation had taken place.

We hold that the BIA erred in ruling that the stop was based on a number of legitimate factors. We conclude that the stop, which resulted solely from Gonzalez' Hispanic appearance, constituted a bad faith and egregious violation of the Fourth Amendment. Accordingly, we reinstate the IJ's decision to grant the motion to suppress and remand for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

On January 17, 1988, Gonzalez was riding as a passenger with his father in a car on his way to work, traveling northbound on Interstate Highway 805, past San Diego. Both men were wearing uniforms displaying the logo of the "International House of Pancakes." Border Patrol Officer Salvador Wilson and another officer also were traveling northbound on Highway 805 on a roving patrol. The officers stopped the car and discovered that, while Gonzalez' father was in possession of documents permitting him to reside legally in the United States, Gonzalez himself could not produce similar documentation. The officers arrested Gonzalez and subsequently learned that he had entered the United States without inspection. Gonzalez, however, did not sign any documents nor did he make any sworn statements; in addition, he requested a deportation hearing. The arresting officers filled out an INS I–213 Form, entitled "Record of Deportable Alien" ("I–213 Form"), which contained the information obtained from the stop. The INS filed an order to show cause with the Immigration Court and commenced deportation proceedings against Gonzalez.

On February 26, 1988, at a master calendar hearing, Gonzalez contested deportability, denied all factual allegations in the order to show cause, sought relief in the form of voluntary departure under 8 U.S.C. § 1254(e), and moved to suppress evidence obtained as a result of the vehicle stop. On March 7, 1988, Gonzalez filed a written motion to suppress evidence on the ground that his detention, arrest, and interrogation constituted an egregious violation of his Fourth Amendment rights. In his motion to suppress, Gonzalez alleged that he had been stopped solely on the basis of his Hispanic appearance. The INS filed an opposition to the motion to suppress in which it reserved the right to cross-examine Gonzalez and asserted its intent to call the arresting officers as witnesses both to authenticate the I–213 Form and to give Gonzalez the opportunity to develop the record as to the allegations of "egregious" conduct.

The hearing began on March 30, 1988. At the outset, the IJ marked as exhibits the order to show cause, the memoranda of appearances before the court, Gonzalez' motion to suppress evidence, and the INS's opposition to the motion. Both the INS and Gonzalez expressly stated that they had no objections to any of the exhibits.

The IJ admitted the I–213 Form into evidence over Gonzalez' objection. The INS then called Officer Wilson to the witness stand. Wilson testified that, on the day of the arrest he and his partner were traveling northbound on Interstate Highway 805, which Wilson described as a major corridor for alien smuggling. Wilson also stated that almost everyone who travels on Interstate Highway 805 is of Hispanic descent. Wilson did not testify as to the relative proportion of Hispanic appearing travelers who are legally in this country and not engaged in alien smuggling versus those who are illegal aliens or otherwise engaged in illegal conduct. Wilson testified that he and his partner were traveling behind the vehicle carrying Gonzalez and that there was nothing wrong or suspicious about the car itself or the manner in which Gonzalez' father was driving. Wilson testified that he drove up to Gonzalez' car and decided to stop the vehicle based on five factors: (1) Gonzalez and his father appeared to be Hispanic; (2) both of them sat up straight, looked straight ahead and did not turn their heads to acknowledge the Border Patrol car; (3) Gonzalez' mouth appeared to be "dry"; (4) Gonzalez was blinking; and (5) both men appeared to be nervous.

Wilson contradicted himself somewhat when, after he read the I–213 Form to re-

fresh his memory, he changed his description of Gonzalez' behavior, stating that "when [Gonzalez and his father] saw us, they turned, they *turned and looked at us,* and right away turned their heads, and just sat straight." [Admin.Rec. (AR) at 71] (emphasis added). He could not recall how Gonzalez was dressed except for the fact that he was wearing a cap. Wilson then stated that, based on his determination that the two men appeared to be nervous, he inferred that they had seen the Border Patrol car, and, based on his experience that in 100% of the cases people who have nothing to hide look at passing Border Patrol cars, Wilson concluded that the two men were nervous. During closing arguments, the INS added an additional factor to be considered in establishing reasonable suspicion that Wilson had not mentioned. The attorney for the INS stated that Gonzalez "was wearing a cap, and I realize that, you know, everybody who is wearing a cap is not an illegal alien, but all these facts put together, seem to indicate articulable facts, to . . . to make a reasonable stop." [AR at 80].

The IJ concluded that "[i]n this case, the evidence shows that the stop involved was based solely on Hispanic appearance, and is an egregious Fourth Amendment violation," [AR at 44]. Accordingly, the IJ granted the motion to suppress the I–213 Form and Wilson's testimony concerning what he learned from the stop.

One and a half years after the deadline for filing a notice of appeal, the INS appealed to the BIA. In its appeal, the INS maintained that the stop was not based solely on Gonzalez' Hispanic appearance; that, in any case, such a stop would not have been an egregious Fourth Amendment violation that warranted applying the exclusionary rule; and that Gonzalez had failed to present a prima facie case of a Fourth Amendment violation.

The BIA reversed the IJ's decision to exclude the I–213 Form and Wilson's testimony on the grounds that the information it contained was accurate and that the stop was not based solely on Gonzalez' Hispanic appearance. The BIA explicitly declined to address whether or not a stop based solely on Hispanic appearance would constitute an egregious violation of the Fourth Amendment. The BIA also "observed" that Gonzalez' motion to suppress failed to present a prima facie case as it did not include a statement or testimony on his own behalf and that "the IJ should have dismissed the motion to suppress" at the outset. [AR at 15]. The BIA gave Gonzalez 30 days in which to depart voluntarily.

Gonzalez timely appealed. We have jurisdiction pursuant to 8 U.S.C. § 1105a (1988).

## DISCUSSION

### 1. The Prima Facie Case

█ A court's conclusion as to whether a plaintiff has satisfied the elements of a prima facie case of a Fourth Amendment violation is reviewed *de novo,* but the underlying factual findings may be reversed only if the evidence is such that no reasonable factfinder could agree with the BIA. *INS v. Elias–Zacarias,* —— U.S. ——, 112 S.Ct. 812, 817, 117 L.Ed.2d 38 (1992).

█ The INS contends that Gonzalez' appeal should be dismissed on the ground that he failed to establish a prima facie case regarding the Fourth Amendment violation. Without deciding whether the BIA correctly determined that Gonzalez did not establish a prima facie case, we hold that, by failing to raise this issue at the appropriate time, the INS has waived any claim of defects with Gonzalez' prima facie case.

At the outset of the March 30, 1988 hearing, the IJ admitted the motion to suppress as one of the exhibits and explicitly asked whether either party had any objections. The INS did not object to the admission of the motion to suppress evidence and did not claim that Gonzalez had failed to establish a prima facie case. Instead, the INS proceeded to defend the claim and introduced testimonial evidence to challenge the validity of the allegations raised in the suppression motion. The INS addressed this issue for the first time in its brief to the BIA.

The Supreme Court has held that "[w]here the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, wheth-

er the plaintiff really did so is irrelevant." *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1982); *see also, Bouman v. Block,* 940 F.2d 1211, 1223 (9th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 640, 116 L.Ed.2d 658 (1991) (when issue has been fully litigated, appellate court does not consider challenge that plaintiff failed to establish prima facie case, but instead looks at the claim on the merits). Although these cases involved Title VII claims, there does not seem to be any reason to treat immigration cases differently. This is especially true considering that the only items missing from Gonzalez' motion to suppress were Gonzalez' affidavit alleging that the officers' conduct was illegal and egregious and, perhaps, his or his father's testimony in support of that allegation.

The cases cited by the INS on the prima facie issue are distinguishable. In each case relied on by the INS, the IJ had dismissed the claim and the INS had not forwarded a defense. For example, in *Matter of Barcenas,* 19 I. & N.Dec. 609 (1988), the IJ had *denied* petitioner's motion to suppress evidence concerning his deportability based on the allegations that the evidence had been obtained by an illegal stop. The BIA affirmed the IJ's *denial* of the motion to suppress; *see also Matter of Burgos,* 15 I. & N.Dec. 278, 279 (BIA 1975) (BIA affirmed denial of motion to suppress); *Matter of Wong,* 13 I. & N.Dec. 820, 821 (BIA 1971) (same); *Matter of Tang,* 13 I. & N.Dec. 691, 692 (BIA 1971) (same).

In this case, the INS acted as if the prima facie case had been made out and the BIA addressed the issue prior to its presentation to this Court. Thus, whether or not Gonzalez had in fact satisfied all the elements required to establish a prima facie case is not relevant to the resolution of this case.

2. *Unreasonable Conduct Under the Fourth Amendment*

The Fourth Amendment requires that officers on roving patrol stop vehicles "only if they are aware of specific articulable facts together with rational inferences from these facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *United States v. Brignoni–Ponce,* 422 U.S. 873, 884, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607 (1975); *see also United States v. Medina–Gasca,* 739 F.2d 1451, 1453 (9th Cir.1984); *United States v. Ogilvie,* 527 F.2d 330, 331 (9th Cir.1975). In determining whether a particular stop by the Border Patrol has met the reasonable suspicion test, it is crucial that "the 'articulable facts' forming the basis of a reasonable suspicion [be] 'measured against an objective reasonable man standard, not by the subjective impressions of a particular officer.'" *Nicacio v. INS,* 797 F.2d 700, 703 (9th Cir.1986) (quoting *Nicacio v. INS,* 595 F.Supp. 19, 22 (E.D.Wash.1984) (quoting *United States v. Rocha–Lopez,* 527 F.2d 476, 477 (9th Cir.1975), *cert. denied,* 425 U.S. 977, 96 S.Ct. 2181, 48 L.Ed.2d 802 (1976))). As the *Nicacio* court explained, all "'permissible deductions' ... or 'rational inferences' ... must ... flow from objective facts and be capable of rational explanation. While an officer may evaluate the facts supporting reasonable suspicion in light of his experience, experience may not be used to give the officers unbridled discretion in making a stop." *Nicacio,* 797 F.2d at 705 (citations omitted).

■ The interpretation of the reasonable suspicion standard is a question of law which we review *de novo, id.* at 703, but the underlying factual determinations are reversed only if the evidence is such that no reasonable fact finder could so find, *Elias–Zacarias,* —— U.S. ——, 112 S.Ct. at 815. Although this Court only reviews the BIA's conclusions and not those of the IJ, *Acewicz v. INS,* 984 F.2d 1056, 1059 (9th Cir.1993), where, as here, the BIA and the IJ disagree on a factual question, especially one involving a credibility determination, the appellate court should give substantial weight to the IJ's finding of facts. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Cardoza–Fonseca v. INS,* 767 F.2d 1448, 1455 (9th Cir.1985) (citing *McMullen v. INS,* 658 F.2d 1312, 1318 (9th Cir.1981)) *aff'd on other grounds* 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987); *see also Saballo–Cortez v. INS,* 761 F.2d 1259, 1266 (9th Cir.1985).

Wilson testified that he stopped Gonzalez based on the following four factors: Gonzalez' failure to look at the Border Patrol car; the fact that he appeared to have a "dry" mouth; the fact that he was blinking; and Gonzalez' Hispanic appearance. Wilson also maintained that it was Gonzalez' and his father's "nervous appearance" that motivated the officers' decision to stop them. This last claim, however, should not be considered a fifth factor because it is not a specific, articulable "fact" but rather, a conclusion that appears to be based on the other four factors.

In granting Gonzalez' motion to suppress both the officer's testimony and the I-213 Form, the IJ found that Gonzalez had been stopped based solely on his Hispanic appearance; that the officers had acted unreasonably; and that this constituted an egregious violation of the Fourth Amendment. The IJ's findings can be interpreted in two ways: (1) The IJ did not believe officer Wilson and thought that Wilson's only reason for stopping Gonzalez was his Hispanic appearance; or (2) the IJ concluded that, as a matter of law, he should not accord any weight to the other factors Wilson considered. The applicable standard of review changes depending on the interpretation of the IJ's finding. If the IJ made a negative credibility finding with regard to Wilson's testimony, the IJ's judgment should be given substantial weight. *See, e.g., Saballo-Cortez,* 761 F.2d at 1266. If, on the other hand, the IJ and the BIA reached conflicting legal conclusions, then we review only the BIA's conclusions under the *de novo* standard. *See, e.g., Charlesworth v. INS,* 966 F.2d 1323, 1325 (9th Cir.1992). In this case, however, it is not necessary to determine the reason for the IJ's conclusion. Without relying on the possibility that the IJ disbelieved Wilson's testimony, we hold that the IJ correctly found that Gonzalez' stop was based solely on his Hispanic appearance. The other factors that Wilson used to justify his decision to stop Gonzalez had such a low probative value that no reasonable officer would have relied on them to determine whether there was reasonable suspicion to make an investigative stop and thus we must disregard them as a matter of law.

Gonzalez' failure to look at the Border Patrol car cannot be accorded any weight in applying the reasonable suspicion test. Under Ninth Circuit law, a driver's failure to look at the Border Patrol cannot weigh in the balance of whether there existed reasonable suspicion for a stop. In *United States v. Mallides,* 473 F.2d 859 (9th Cir.1973), "[s]ix Mexican-American appearing males were riding in a Chrysler Imperial at dusk, sitting erectly, and none turned to look at the passing patrol car. From these facts, the officers suspected that the occupants were illegal aliens," *id.* at 861. The *Mallides* court held that "[t]ested by any objective standard there is nothing suspicious about six persons riding in a sedan. The conduct does not become suspicious simply because the skins of the occupants are nonwhite or because they sit up straight or because they do not look at a passing police car." *Id.* The court explained that "[t]he 'furtive gesture' syndrome has been overextended.... Here the officers concluded that not looking was suspicious. [Conversely, in] *People v. Williams,* 20 Cal.App.3d 590 [97 Cal.Rptr. 815] (1971), the officers testified that defendant's looking at an approaching police car was suspicious." *Id.* at n. 4. In rejecting the government's claim that the officers' expertise about the behavior of illegal aliens rendered otherwise innocent conduct suspect behavior, the *Mallides* court stated that "[n]either the Supreme Court nor this court has ever upheld the legality of a detention based upon an officer's unsupported intuition, and we refuse to do so now." *Id.* at 862. Similarly, in *Nicacio,* the court held that "lack of eye contact is not an appropriate factor to consider." 797 F.2d at 704. Again, in *United States v. Munoz,* 604 F.2d 1160 (9th Cir. 1979), this Court held that the failure of the drivers to look at the officers did not support a finding of reasonable suspicion. *See id.* at 1161.

Other circuits have reached the same conclusion. For example, in *United States v. Lopez,* 564 F.2d 710 (5th Cir.1977), two Border Patrol agents stopped Lopez's vehicle and testified that "they became suspicious when appellant avoided making eye contact with them." *Id.* at 711. The *Lopez* court explained that where a factor and its oppo-

site can both be used to justify a stop, the court should not give weight to either factor. A driver's failure to look at the border patrol car is such a factor since the opposite reaction, a driver's repeated glancing at a Border Patrol car, can also be used to justify the agent's suspicion. To give weight to this type of justification "would put the officers in a classic 'heads I win, tails you lose' position [and] the driver, of course, can only lose." *Id.* (citation omitted). The *Lopez* court held that a driver's failure to look at the border patrol car "cannot weigh in the balance whatsoever.... Reasonable suspicion should not turn on the ophthalmological reactions of the [driver]." *Id.* (citations omitted).

Therefore, Gonzalez' failure to look at the Border Patrol vehicle should have been disregarded as a matter of law.

Wilson's testimony regarding his determination that Gonzalez was nervous in part because Gonzalez' mouth was "dry" also must be disregarded for two reasons. First, a reasonable fact-finder could not have believed Wilson's testimony on this issue. Officer Wilson contended that he was able to notice that Gonzalez had a "dry" mouth while driving next to him at normal speed. Wilson's claim strains credulity. Assuming that normal speed on a highway is 55 m.p.h., and considering that, according to Wilson's own testimony, Gonzalez was not looking at the Border Patrol car, a reasonable fact-finder could not have believed that Wilson could have detected the moisture level in Gonzalez' mouth. Second, assuming *arguendo* that Wilson could perceive that Gonzalez' mouth was dry, the record in this case does not support the inference that the officer could reasonably have concluded that Gonzalez was nervous. Given that the INS did not introduce any reliable, objective evidence that people who are nervous have a dry mouth, Wilson's alleged inference, that Gonzalez was nervous rather than thirsty, for example, was at best based on a subjective intuition about how people physiologically manifest their mental state. This Court, however, has repeatedly stated that "subjective feelings do not provide any rational basis for separating out the illegal aliens from the American citi-

zens and legal aliens." *Nicacio,* 797 F.2d at 705.

Finally, in determining whether the reasonable suspicion standard was met, we must disregard Wilson's testimony that Gonzalez was blinking more than normal. First, the INS introduced no objective evidence to support its contention that blinking more than normal is evidence of being nervous and thus, this inference also appears to be based on the officer's "unsupported intuition." *See Mallides,* 473 F.2d at 862 (holding that the INS needs to set forth objective evidence to show reasonable suspicion). Second, in determining whether there existed reasonable suspicion, we cannot accord any weight to this factor, because both blinking and not blinking, like looking or not looking at a Border Patrol car, can be used to justify a stop. *See id.* at 861; *see also Lopez* 564 F.2d at 711.

The officers also failed to consider or decided to ignore other significant factors, such as the fact that both Gonzalez and his father were wearing "International House of Pancakes" uniforms, suggesting that they worked in the United States, the fact that the car looked normal with nothing to indicate that people might have been hiding in the trunk, and the fact that the two men did not attempt to evade from the officers. These factors weighed *against* the officers' conclusion that Gonzalez and his father looked suspicious.

In sum, we agree with the IJ that the officers stopped Gonzalez solely because of his ethnicity and that the other alleged reasons for the stop were either fabricated or of such minimal probative value in determining whether Gonzalez and his father looked suspicious that no reasonable officer would have relied on them.

In *Brignoni–Ponce,* the Supreme Court held that "Hispanic appearance alone is insufficient to justify a stop." 422 U.S. at 886–87, 95 S.Ct. at 2582–83. In *Nicacio,* the Ninth Circuit held that "Hispanic-looking appearance and presence in an area where illegal aliens frequently travel are not enough to justify a stop to interrogate the occupants of a vehicle." 797 F.2d at 703. Because we have concluded that the officers in this case

decided to stop Gonzalez because of his Hispanic appearance alone, the stop was not based on reasonable suspicion and thus constituted a Fourth Amendment violation.

### 3. Egregious Conduct

■ We cannot determine whether the IJ properly excluded the I–213 Form based solely on our conclusion that the officers' conduct was unreasonable. In *INS v. Lopez–Mendoza*, 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984), the Supreme Court applied the test articulated in *United States v. Janis*, 428 U.S. 433, 446–448, 96 S.Ct. 3021, 3028–29, 49 L.Ed.2d 1046 (1976), to determine the applicability of the exclusionary rule to civil proceedings, specifically in the context of an immigration hearing. A majority of the Court concluded that, because the deterrent effect of applying the exclusionary rule in civil cases is minimal and its cost is significant, as a general rule, evidence obtained in an unlawful manner will not be excluded from civil proceedings. *Lopez–Mendoza*, 468 U.S. at 1046, 104 S.Ct. at 3487.[1] The *Lopez–Mendoza* Court, however, limited its holding to situations that do not involve "egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained." *Id.* at 1050–51, 104 S.Ct. at 3489.[2]

In *Adamson v. C.I.R.*, 745 F.2d 541, 545–46 (9th Cir.1984), this Court interpreted the "egregiousness" caveat in *Lopez–Mendoza* and established that egregious Fourth Amendment violations warrant the application of the exclusionary rule in civil proceed-

ings.[3] In its discussion of *Lopez–Mendoza*, the *Adamson* court first emphasized that the Court based its general holding on its conclusion that the exclusionary rule will have little deterrent effect in the civil context. *See Adamson*, 745 F.2d at 545 (citing *Lopez–Mendoza*, 468 U.S. at 1043, 104 U.S. at 3485). The *Adamson* court then noted that in leaving room for courts to apply the exclusionary rule in situations involving egregious Fourth Amendment violations, *Lopez–Mendoza* implicitly recognized that the "imperative" of safe-guarding judicial integrity, another core function of the exclusionary rule, would sometimes require application of the rule even in the civil context. As the *Adamson* court explained:

> Although the Court has often emphasized only the deterrent purpose of the [exclusionary] rule, ... we know from the language in *Lopez–Mendoza* that deterrence is not the only consideration. [468 U.S. at 1050], 104 S.Ct. at 3490. The Court has never abandoned its pronouncement ... that in addition to deterrence, the exclusionary rule serves the vital function of preserving judicial integrity. In fact, in *United States v. Leon*, [468 U.S. 897], 104 S.Ct. 3405 [82 L.Ed.2d 677] (1984), the Court noted the vitality of the 'imperative of judicial integrity.' ... Federal courts cannot countenance deliberate violations of basic constitutional rights. To do so would violate our judicial oath to uphold the Constitution of the United States.... When evidence is obtained by deliberate violations of the Fourth Amendment, or by conduct a reasonable officer should know is in violation of the Constitution, the proba-

1. *See* Henry G. Watkins, *The Fourth Amendment and the INS: An Update of Locating the Undocumented and a Discussion on Judicial Avoidance of Race–Based Investigative Targeting in Constitutional Analysis*, 28 San Diego L.Rev. 499, 561–62 (1991) (discussing the Ninth Circuit's interpretation of *Lopez–Mendoza*).

2. The majority opinion in *Lopez–Mendoza*, written by Justice O'Connor, was joined by four other Justices. Although the part of the opinion where the "egregiousness" caveat appears was joined by only three other Justices, the four dissenters, who contended that the exclusionary rule applies in the civil and the criminal contexts alike, would have approved any limitation on the majority's

decision. 468 U.S. at 1051–61, 104 S.Ct. at 3489–95 (Brennan, White, Marshall, and Stevens, JJ., dissenting).

3. In *Adamson*, the court stated: "Adamson's contention presents us with the question whether a bad faith violation of an individual's fourth amendment rights requires application of the exclusionary sanction in a civil tax proceeding. We believe that it does." *Adamson*, 745 F.2d at 545. In *Adamson*, however, we declined to apply the exclusionary rule and determined that admitting the evidence would not have implicated the integrity of the courts because, *in that case*, the evidence had not been obtained through egregious conduct. *See id.* at 546.

tive value of that evidence cannot outweigh the need for judicial sanction.

*Adamson,* 745 F.2d at 545–46 (citations omitted).[4]

Accordingly, *Adamson* requires that we decide whether the IJ correctly found that the present case involves an egregious Fourth Amendment violation.

Whether the conduct of the Border Patrol officers was sufficiently egregious to require application of the exclusionary rule is a question of law that we review *de novo, United States v. McConney,* 728 F.2d 1195, 1200 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984), but the findings of fact are reviewed for substantial evidence. *Elias–Zacarias,* —— U.S. ——, 112 S.Ct. at 815.

In clarifying the "egregiousness" exception, the *Lopez–Mendoza* Court cited *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), as an example of an egregious constitutional violation. To recover evidence of narcotics, the arresting officers in *Rochin* had forced the defendant to swallow an emetic solution to induce vomiting. *Id.* at 166, 72 S.Ct. at 206. According to the *Rochin* Court, conduct that "shocks the conscience" constitutes an egregious constitutional violation. *Id.* at 172, 72 S.Ct. at 209. As we explained in *Adamson,* however, "the *Lopez–Mendoza* Court's citation to *Rochin* was [*not* ] meant to limit 'egregious violations' to those of physical brutality." 745 F.2d at 545 n. 1. Instead, under Ninth Circuit law, all "bad faith violation[s] of an individual's fourth amendment rights" are con-

sidered sufficiently egregious to "require[ ] application of the exclusionary sanction in a civil ... proceeding." *Id.* at 545.[5]

Under Ninth Circuit law, a bad faith constitutional violation occurs when "evidence is obtained by deliberate violations of the fourth amendment, or by conduct a *reasonable officer should have known* is in violation of the Constitution." *Adamson,* 745 F.2d at 545. (emphasis supplied). It appears that the BIA has also adopted a reasonableness standard to determine whether an officer has engaged in a bad faith constitutional violation. *See Matter of Toro,* 17 I. & N.Dec. 340, 343 (BIA 1980) (applying an objective standard to determine whether the arresting officers had acted in good faith).[6]

In applying an objective standard of "bad faith", as required by *Adamson,* 745 F.2d at 546, we emphasize that in the present case we only determine what constitutes a bad faith stop based solely on race, as proscribed by *Brignoni–Ponce,* and do not purport to be setting forth the standard for determining what constitutes a bad faith constitutional violation in other contexts. There are three principal reasons why, in the context of a race-based stop by a roving patrol, it is especially appropriate to adopt a reasonableness standard. First, we have long regarded racial oppression as one of the most serious threats to our notion of fundamental fairness and consider reliance on the use of race or ethnicity as a shorthand for likely illegal conduct to be "repugnant under any circumstances."[7] As a federal court, we must be especially careful to ensure that our laws not

---

4. *See also Cervantes–Cuevas v. INS,* 797 F.2d 707, 710 (9th Cir.1985) (recognizing that *Lopez–Mendoza* does not preclude application of the exclusionary rule in cases involving egregious constitutional violations or where the probative value of the evidence has been undermined).

5. We emphasize that neither we nor the *Adamson* court hold that *only* bad faith violations are egregious, but rather that *all* bad faith constitutional violations are egregious. *See Adamson,* 745 F.2d at 545, n. 1.

6. In *Toro,* the BIA did not inquire into the officers' subjective state of mind, but rather based its conclusion that the officers had acted in good faith on the grounds that, at the time of the arrest, the INS's internal policy did not prohibit race-based investigative stops and the Supreme

Court had not yet decided *Brignoni–Ponce.* Presumably, had the BIA decided that the officers reasonably could not have believed that they were acting in accordance with the Constitution, it would have held that they had acted in bad faith. *See Toro,* 17 I. & N. Dec. at 343.

7. *United States v. Martinez–Fuerte,* 428 U.S. 543, 572, n. 1, 96 S.Ct. 3074, 3089, n. 1, 49 L.Ed.2d 1116 (1976) (Brennan J. dissenting). In *Martinez–Fuerte,* Justice Brennan reminded us of this important principle stating "[t]hat law in this country should tolerate use of one's ancestry as probative of possible criminal conduct is repugnant under any circumstances." *Id.* (quoted in Watkins, *supra* n. 6, at 562, n. 345).

encourage, even if only indirectly, such impermissible uses of race. Where as here it has already been established that the stop was based solely on Gonzalez' race, the government's action is analogous to a facial racial classification. We have long combatted race-based classifications, especially when they are not designed to advantage less powerful racial groups. As the Supreme Court has emphasized, " 'discrimination on the basis of race is illegal, immoral, unconstitutional, inherently wrong, and destructive to democratic society.' " *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 521, 109 S.Ct. 706, 736, 102 L.Ed.2d 854 (1989) (Scalia J. concurring) (citation omitted). Similarly, in *Frazer v. United States,* 18 F.3d 778 (9th Cir.1994) (Trott J.), the Ninth Circuit reaffirmed its commitment to "our national goal of ending racism," *id.* at 784. In *Frazer,* we emphasized that "[a]s a nation we have acted decisively to remove all vestiges of racial discrimination from our lives [and that] [n]ot for a moment will we tolerate racist behavior." *Id.* at 785. In the equal protection context, for example, in light of the abhorrent history of race-based classifications, facial racial classifications carry a presumption of bad faith and automatically trigger strict scrutiny regardless of evidence of intent. *See, e.g., Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985) ("[L]aws grounded in ... considerations [of race] are deemed to reflect prejudice and antipathy."); *see also Washington v. Seattle School Dist. No. 1,* 458 U.S. 457, 485, 102 S.Ct. 3187, 3202–03, 73 L.Ed.2d 896 (1982) ("A racial classification, regardless of purported motivation, is presumptively invalid.") (citation omitted); *Croson,* 488 U.S. at 493, 109 S.Ct. at 721 (same).

Second, the *Lopez–Mendoza* Court's conclusion that there is virtually no need to deter Border Patrol officers relies in large part on the Court's determination that "the INS has its own comprehensive scheme for deterring Fourth Amendment violations by its officers." 468 U.S. at 1044–45, 104 S.Ct. at 3486. The fact that INS officers receive extensive training in Fourth Amendment law, however, also supports the inference that when an INS officer makes a stop based solely on race, he or she has deliberately violated the law or has acted in conscious disregard of the Constitution.

Third, as we have recognized in prior cases, racial stereotypes often infect our decision-making processes only subconsciously. *See, e.g., United States v. Bishop,* 959 F.2d 820, 826–28 (9th Cir.1992) (acknowledging that racism often affects decision-making only unconsciously). Thus, Border Patrol officers may use racial stereotypes as a proxy for illegal conduct without being subjectively aware of doing so. *See* Charles R. Lawrence III, *The Id, The Ego, and Equal Protection: Reckoning with Unconscious Racism,* 39 Stan.L.Rev. 317, 322 (1987) (explaining that "a large part of the behavior that produces racial discrimination is influenced by unconscious racial motivation"). By applying a reasonableness standard of bad faith in this context we avoid making the determination of what constitutes an egregious violation of *Brignoni–Ponce* turn on the level of self-awareness of a particular officer.[8]

In the present case, the officers should have known that their decision to stop Gonzalez based solely on his Hispanic appearance was unconstitutional. Unlike in *Toro,* the acts of the officers here occurred long after the Supreme Court in *Brignoni–Ponce* made clear that the Constitution does not permit such stops and long after the INS amended its own policy to specifically prohibit race-based stops. Under these circumstances, we cannot conclude that the officers who stopped Gonzalez acted on a good faith

---

**8.** The requirement that, in an equal protection claim, the plaintiff prove that the alleged discrimination was intentional, *see, e.g., Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1976), does not require that we apply a subjective standard of bad faith in this context. As discussed above, when dealing with an unreasonable stop based solely on a person's race or ethnicity, the question of whether an agent's conduct constitutes a bad faith violation only arises once it has *already* been established that the stop was based solely on race. Under these circumstances, it is not necessary to prove intent. Moreover, because the exclusionary rule is not designed to punish individual officers, the fact that the officers did not subjectively intend to discriminate does not require us to tolerate unconscious racist conduct.

belief that their conduct was constitutionally permissible.

Not only should the officers in this case have known that the decision to stop Gonzalez solely on the basis of his race was unconstitutional, but also their subsequent rationalization of their decision, using justifications that a reasonable officer should have known would be disregarded as a matter of law, compounds the gravity of their actions and only confirms our conclusion that they acted in bad faith.

The INS maintains that, under *Lopez–Mendoza,* a Fourth Amendment violation should not be considered egregious unless it *both* transgresses notions of fundamental fairness *and* it undermines the probative value of the evidence obtained. According to the INS, even if the officers' race-based decision to stop Gonzalez was fundamentally unfair, the probative value of the I–213 Form was not undermined by the manner in which it was obtained and thus should have been admitted into evidence. Contrary to the INS' contention, however, under both *Lopez–Mendoza* and controlling Ninth Circuit law, a fundamentally unfair Fourth Amendment violation is considered egregious regardless of the probative value of the evidence obtained.

The *Lopez–Mendoza* Court cited *Rochin* and *Toro* as examples of egregious constitutional violations. In *Rochin,* the evidence obtained had a high probative value—inducing vomiting to recover evidence that the officers believed had been swallowed may have been fundamentally unfair, but it did not undermine the probative value of the narcotics obtained. *Rochin,* 342 U.S. at 166, 72 S.Ct. at 206. In *Toro,* the BIA suggested that a stop based on Hispanic appearance alone would constitute an egregious Fourth Amendment violation if the Border Patrol officers acted in bad faith, regardless of the probative value of the evidence obtained. *See Toro,* 17 I. & N.Dec. at 343 (stating that under the Fifth Amendment, "[t]o be admis-

sible in deportation proceedings, evidence must be probative and its use fundamentally fair"). Under the INS' recommendation, the Supreme Court's own examples of egregious conduct would not satisfy its definition of the term.

Ninth Circuit law also requires us to reject the INS' position. In *Adamson,* the Ninth Circuit held that "[w]hen evidence is obtained by deliberate violations of the Fourth Amendment, or by conduct a reasonable officer should know is in violation of the Constitution, *the probative value of that evidence cannot outweigh the need for judicial sanction.*" 745 F.2d at 546 (emphasis supplied).

Finally, under the INS' interpretation of *Lopez–Mendoza,* courts would have to ignore the most obvious and offensive constitutional violations as long as the probative value of the evidence obtained was not undermined. As discussed above and as Judge Tang's special concurrence emphasizes, *see post,* however, both the *Lopez–Mendoza* Court and the *Adamson* court require that we apply the exclusionary rule when admitting the evidence would implicate judicial integrity. Under the interpretation of *Lopez–Mendoza* that the INS would have us adopt, the goal of maintaining judicial integrity would not be served. Therefore we must reject the INS' suggestion that we admit evidence obtained in a fundamentally unfair manner as long as it has a high probative value.

The INS' contention, that *Cervantes–Cuevas v. INS,* 797 F.2d 707 (9th Cir.1985), requires a different result, is not persuasive. The petitioner in that case did not even allege that the arrest was based on Hispanic appearance alone or was otherwise fundamentally unfair. He merely contended that the Border Patrol had stopped him without reasonable suspicion. *Id.* at 708.[9] In determining that no egregious violation had occurred, the *Cervantes–Cuevas* court expressly held that the stop had been based on

---

9. Similarly, the dissent's reliance on *Benitez–Mendez v. INS,* 760 F.2d 907 (9th Cir.1983), is misplaced. In *Benitez–Mendez,* the petitioner did not maintain that he had been stopped because of his race or even that the INS officers' conduct had been egregious. Consequently, the *Benitez–Mendez* court correctly held that in civil deporta-

tion proceedings, a fourth amendment violation will not trigger the application of the exclusionary rule. *Id.* at 910. The *Benitez–Mendez* court, however, was not presented with the question whether the exclusionary rule applies in cases involving race-based stops. Therefore, *Benitez–Mendez* is not controlling.

several legitimate factors other than the petitioner's Hispanic appearance. *Id.* at 710.[10] In *Cervantes–Cuevas,* this Court held that where an unlawful stop is *not* fundamentally unfair, the petitioner must show that the probative value of the evidence was undermined by the unlawful stop. *Id.* at 710–11. *Cervantes–Cuevas* thus is not controlling in the present case.

Accordingly, we conclude that the officers' conduct in this case constituted a bad faith, egregious constitutional violation that warrants the application of the exclusionary rule.

## CONCLUSION

We hold that the Border Patrol officers stopped Gonzalez solely on the basis of his Hispanic appearance and violated the Fourth Amendment in bad faith. Because this race-based stop was an egregious constitutional violation, we are required to suppress the evidence obtained. Therefore, the petition for review is granted and the matter is remanded to the BIA for further proceedings consistent with this opinion.

**REVERSED and REMANDED.**

TANG, Senior Circuit Judge, concurring:

I concur fully in Judge Nelson's opinion. I write separately to emphasize that we should not allow our courts to be used to sanction racism in any form. The Supreme Court recognized in *Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), that court enforcement of discriminatory covenants was state action subject to the dictates of the Fourteenth Amendment. Allowing the Immigration Service to utilize evidence obtained from racially discriminatory treatment of Hispanics would entail our participation in that discrimination.

The exclusionary rule here serves the essential function of preserving judicial integrity. *Elkins v. United States,* 364 U.S. 206, 222, 80 S.Ct. 1437, 1443, 4 L.Ed.2d 1669 (1960). Where federal agents violate the Fourth Amendment in bad faith by stopping a person solely based on race, judicial integrity would be impaired by allowing the introduction of evidence obtained by racially discriminatory action. "Federal courts cannot countenance deliberate violations of basic constitutional rights. To do so would violate our judicial oath to uphold the Constitution of the United States." *Adamson v. C.I.R.,* 745 F.2d 541, 546 (9th Cir.1984).

CHOY, Circuit Judge, dissenting in part:

The majority rejects the INS' claim that Gonzalez failed to establish a prima facie violation of the Fourth Amendment under *United States v. Brignoni–Ponce,* 422 U.S. 873, 884, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975), and finds that the BIA attached undue weight to inconclusive suspicional factors cited by the INS as the "articulable facts" supporting the Border Patrol's stop of Gonzalez' vehicle. With these portions of the majority's opinion I concur. However, because I believe this case falls squarely within the rule, rather than any untested exception, stated in *INS v. Lopez–Mendoza,* 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984), I do not join part 3 of the majority opinion concluding that the exclusionary rule bars admission of Gonzalez' inculpatory I–213 Form at his deportation hearing. On this point I would affirm the BIA's contrary ruling.

In *Lopez–Mendoza* the Court rejected extension of the exclusionary rule to civil deportation hearings after extensive cost-benefit analysis. *Id.* at 1041–1050, 104 S.Ct. at 3484–89. In view of the "staggering dimension of the problem that the INS confronts,"

---

**10.** We agree with the *Cervantes–Cuevas* court that "[i]n the absence of some proof casting doubt on the probative value of voluntary statements following an illegal detention, evidence that the arrest was *unlawful* does not affect the admissibility of an undocumented alien's statements." *Cervantes–Cuevas,* 797 F.2d at 711 (emphasis added). The *Cervantes–Cuevas* court, however, was not presented with the issue of whether evidence obtained through egregious vi-

olations is admissible and thus could not have decided that question. Our reading of the holding in *Cervantes–Cuevas,* moreover, explains why the *Cervantes–Cuevas* court does not attempt to reconcile its holding with the fact that the *Lopez–Mendoza* Court cites to *Rochin* and *Toro* as examples of egregious violations or to distinguish the holding in *Adamson,* a case decided one year before *Cervantes–Cuevas.*

*id.* at 1049, 104 S.Ct. at 3488, the Court concluded that the marginal deterrence of Fourth Amendment violations gained would not justify the social costs imposed, including hampering administrative efficiency, sacrificing probative evidence and burdening the enforcement of immigration laws. Nonetheless, in dictum on which the majority relies, a plurality of the Court cautioned that it was not dealing with "egregious violations of the Fourth Amendment ... that might transgress notions of fundamental fairness and undermine the probative value of the evidence." *Id.* at 1050–51, 104 S.Ct. at 3489.

In my view, neither the facts nor the factors considered by the Court in *Lopez–Mendoza* are dispositively different from those at issue in the case before us. At issue in the Court's utilitarian calculus no less than in the case at bar was "the exclusion of credible evidence gathered in connection with peaceful arrests by INS officers." *Id.* at 1051, 104 S.Ct. at 3489. One of the two respondents in *Lopez–Mendoza* was arrested in a warrantless INS factory sweep under circumstances of pandemonium in which the interrogating officers could not recall the details of individual interrogations, including which workers they personally questioned and the specific ground for detaining the respondent beyond his "evasive" demeanor. *Id.* at 1037, 104 S.Ct. at 3482. Here, to an equal degree and in an essentially similar fashion, a roving patrol lacking either a warrant or a sufficient quantum of individualized suspicion singled out Gonzalez for peaceful questioning as to his alienage on the basis of a relevant but insufficient factor, his apparent ethnicity. *See Brignoni–Ponce,* 422 U.S. at 884, 95 S.Ct. at 2581. Here, as in *Lopez–Mendoza,* the officers recited in support of their actions familiar factors, apart from Hispanic appearance, that we dismissed as disingenuous or ambiguous and therefore incapable of insulating their conduct from the prohibition against solely race-based investigatory stops explicated in *Brignoni–Ponce. Lopez–Mendoza v. INS,* 705 F.2d 1059, 1063 (9th Cir. 1983), *rev'd on other grounds, Lopez–Mendoza,* 468 U.S. 1032, 104 S.Ct. 3479.

Moreover, in the decade since the Court overruled our application of the exclusionary rule to deportation hearings in *Lopez–Mendoza,* Congress has on a number of occasions underscored the public policy against the presence and employment of unregistered aliens in the country, a consideration at center stage of the "backdrop" to the Court's cost-benefit analysis. *See Maka v. INS,* 904 F.2d 1351, 1358 (9th Cir.1990) (enactment of Immigration Reform and Control Act of 1986, with its severe penalties for hiring undocumented aliens, "radically changed immigration law"). With the backlog of immigration cases and the "staggering dimensions" of the INS' enforcement task continuing unabated, unignorable advantages remain to keeping deportation proceedings streamlined and unencumbered by the exclusionary rule's intricate jurisprudence in relatively run-of-the-mill cases such as this.

The majority closely analyzes portions of the *Lopez–Mendoza* dictum to infer that the Court inadvertently drafted in the conjunctive the fundamental fairness and probative value prongs of the egregiousness test. Having decoupled the two prongs, the majority reasonably sets out to expand the category of egregious violations beyond acts of physical brutality. Not clearly proceeding under the rubric of either prong, my colleagues then equate egregiousness with bad faith transgressions of the Fourth Amendment whose fruits would impermissibly compromise judicial integrity upon their entry into the courtroom.

To be sure, dictum in *Adamson v. Commissioner,* 745 F.2d 541, 545–46 (9th Cir. 1984), supports this result. Given the distinct institutional setting in *Adamson,* a tax case, and our holding that the exclusionary rule was inapplicable in that case, I submit that this dictum lends little support to the majority's extension of the exclusionary rule. Of considerably greater precedential value is our later holding in *Benitez–Mendez v. INS,* 760 F.2d 907, 909 (9th Cir.1985), that under *Lopez–Mendoza* the exclusionary rule does not bar admission in a deportation hearing of an illegally obtained Form I–213 stemming from a peaceful arrest, notwithstanding the Border Patrol's inability to "articulate objective facts providing a reasonable suspicion that [the petitioner] was an alien illegally in

this country." Given the essentially similar facts involved here and in *Benitez–Mendez,* I believe our holding in that case further precludes the result reached by the majority in part 3 of the opinion.[1]

In addition, insofar as judicial integrity persists as a factor to be weighed in support of the exclusionary rule generally, Justice Marshall's eloquent dissent in *Lopez–Mendoza,* 468 U.S. at 1060–61, 104 S.Ct. at 3494–95, gave the Court full opportunity to reflect on this consideration. That Justice O'Connor nonetheless omitted judicial integrity from her solely deterrence-oriented opinion would therefore appear to be less a matter of oversight than a deliberate decision to exclude that consideration from the analysis governing the specific context before us.

On the other hand, I concede that *Lopez–Mendoza* invites creative interpretation of the sort in which my colleagues thoughtfully engage, insofar as the "egregious violation" dictum contains a citation to a case, *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), not fully in harmony with a literal reading of the plurality's conjunctive, two-pronged caveat. But I attach greater weight than does the majority to Justice O'Connor's phrasing of the Court's holding that "evidence gathered in connection with *peaceful* arrests ... need not be suppressed in an INS civil deportation hearing." *Lopez–Mendoza,* 468 U.S. at 1051, 104 S.Ct. at 3489 (emphasis added). Absent resort to reliable but shocking methods of obtaining evidence represented by the emetic solution administered in *Rochin,* this formulation suggests that the exclusionary rule will not apply to civil deportation hearings where the INS refrains from unpeaceable (but not necessarily brutal) tactics which commonly undermine both fundamental fairness and the probative value of the evidence seized thereby. *See Cervantes–Cuevas v. INS,* 797 F.2d 707, 711

(9th Cir.1985) (statements following illegal alien's unlawful detention are admissible under *Lopez–Mendoza* absent "proof casting doubt on the probative value of voluntary statements").

I share my colleagues' aim of deterring INS stops impermissibly premised on race alone and I am sympathetic with their endeavor to shield judicial integrity from the taint of ostensible collusion in race-based INS round-ups. However, in deeming egregious the INS' relatively uneventful detention of Gonzalez, the majority pursues a path I do not believe we are free to follow after *Lopez–Mendoza, Cervantes–Cuevas* and *Benitez–Mendez.* With unimpeachable intentions but untenable results, my colleagues seek to deter INS misconduct by expanding the egregiousness exception in cases involving objective bad faith by the INS. Yet they inflate this limitation to such an extent that even the INS' uncondoned but comparatively pedestrian violations in *Lopez–Mendoza* would merit suppression of derivative evidence the Court held was admissible.

Rather than elevate the egregiousness exception on so thin and reversible a need into a virtual rule almost categorically contrary to the holding in *Lopez–Mendoza,* or complicate the limitation with objective inquiries into INS officers' good or bad faith, we would better serve the integrity of the judiciary and preserve the body of Fourth Amendment laws currently shielding undocumented aliens by expanding injunctive relief aimed at abuses of this sort, a method of control encouraged by the Court in *Lopez–Mendoza* and approved by us in a more limited geographical context in *Nicacio v. INS,* 768 F.2d 1133, 1140 (9th Cir.1985). In *Nicacio* we upheld a district court injunction in Washington state enjoining wholesale, warrantless investigatory stops of the Hispanic community and im-

---

1. In my view the majority too readily dismisses *Benitez–Mendez* as controlling authority on the basis that the petitioner did not explicitly allege a race-based stop or egregious violation of the Fourth Amendment. *Ante* at 1451, n. 9. I am *not* persuaded that on rehearing the court focused, or was required to. focus, exclusively on the rule in *Lopez–Mendoza* while ignoring potential exceptions, merely because Benitez–Mendez failed (assuming that he had the opportunity to rephrase his argument in light of the intervening case) to incant the qualifier "egregious". To the contrary, given the careful consideration in *Benitez–Mendez* of the voluntariness of the petitioner's responses and the absence of physical force or intimidation, the court more plausibly concluded that the peaceful nature of the unlawful arrest rendered the egregiousness exception inapplicable, notwithstanding the apparent but constitutionally inadequate basis for the stop.

posing on the INS the requirement that its officers record all such stops. By advancing down this path in lieu of the majority's, we would establish a fuller, better documented record on which to revisit the alternative limitation on the holding in *Lopez–Mendoza* to be triggered "if there developed good reason to believe that Fourth Amendment violations by INS officers were widespread." 468 U.S. at 1050, 104 S.Ct. at 3489 (citation omitted).

I therefore respectfully dissent from part 3 of the majority opinion.